IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

JOSHUA PAUL COX,                        §
                                        §
            Movant,                     §
                                        §
v.                                      §        Civil No. 6:21-CV-65-H-BU
                                        §        (6:20-CR-16-H-BU-1)
                                        §
UNITED STATES OF AMERICA,               §
                                        §
            Respondent.                 §

## REPORT AND RECOMMENDATIONS

The Court has under consideration Joshua Paul Cox's Amended Motion Under 28

U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence. Cv. Dkt. No. 23.[1] Cox initiated

this case by timely filing his original pro se motion on October 25, 2021. Cv. Dkt. No. 1.

The sole issue initially raised by Cox was that he "was denied the effective assistance of

counsel" in that "counsel failed to consult Cox regarding filing an appeal after sentencing

and completely ignored Cox's instruction to file an appeal." Cv. Dkt. No. 1 at 4. The

Government filed a response to Cox's pro se motion requesting an evidentiary hearing on

the sole issue raised by Cox, Cv. Dkt. No. 6, and United States District Judge James

Wesley Hendrix then referred this matter to the undersigned to conduct the hearing and

issue a report and recommendation. Cv. Dkt. No. 7.

---

[1] References in this Report and Recommendation to docket entries in this civil case will be preceded by the designation "Cv. Dkt. No.," while references to docket entries in Cox's underlying criminal case of conviction, Criminal Action No. 6:20-CR-00016-H-BU, will be preceded by the designation, "Cr. Dkt No."

The undersigned entered an Order setting Cox's Motion for a hearing and appointed counsel for Cox. Cv. Dkt. No. 8. Cox's newly appointed counsel then filed an Unopposed Motion to Expand Appointment Order that requested permission to "amend or supplement Mr. Cox's Motion under 28 U.S.C. § 2255 to include an additional claim of ineffective assistance of counsel, namely that trial counsel unreasonably and prejudicially failed to challenge the distribution enhancement under USSG §2G2.1(b)(3)." Cv. Dkt. No. 14 at 1. Judge Hendrix granted the Unopposed Motion and referred the then-forthcoming Amended Motion to the undersigned to conduct a hearing and to issue a report and recommendation. Cv. Dkt. No. 20.

Cox then filed his Amended Motion raising claims for relief based on allegations that counsel was ineffective for (1) failing to file a notice of appeal and failing to consult Cox regarding the filing of a notice of appeal (Ground One), and (2) failing to challenge the 2-level adjustment in U.S. Sentencing Guidelines Manual (USSG) § 2G2.1(b)(3) on the basis that (a) the Government did not and could not prove the subject images contained sexually explicit conduct, thus they were neither criminal nor constituted distribution under the Guidelines, and (b) even if the images were sexually explicit, their distribution in 2015 did not constitute relevant conduct under the offense of conviction (Ground Two). Dkt. No. 22.

On August 18, 2022, the undersigned held an evidentiary hearing, received sworn testimony from Cox and his former trial attorney, Fred Brigman, and took the matter under

advisement.[2] Now, for reasons explained below, the undersigned recommends that both grounds of Cox's Amended Motion be denied.

I.    FACTUAL AND PROCEDURAL BACKGROUND

**A.    Cox's arrest and the investigation**

Cox was arrested in May 2019 in connection with a separate state investigation. Cr. Dkt. No. 30 at 3. He was twenty (20) years old at the time. *Id.* During a post-arrest interview, Cox consented to a law enforcement search of his phone. *Id.* at 3. The search revealed "numerous sexually explicit images and videos of a minor female who Cox identified as 'Jane Doe 1' and whom he believed was younger than 18 years old." *Id.* Cox's Factual Resume stipulates to the details of this search:

> In total, there were 658 images and 74 videos of "Jane Doe 1" engaging in sexually explicit conduct from August 1, 2018, to April 26, 2019. Each of these images and videos met the definition of "child pornography" under federal law.

*Id*. It appears undisputed that all images and videos found on Cox's phone during the 2019 search depicted sexually explicit conduct and dated back to 2018. *Id.*

On October 15, 2019, Jane Doe 1 was interviewed by the case agent about her relationship with Cox. Cv. Dkt. No. 14-1. That interview was recorded by the agent in his Report of Investigation (ROI). Cv. Dkt. No. 14-1. The following factual statements were taken from the ROI of that interview.

---

[2] The undersigned also expanded the scope of the evidentiary hearing to include the new ineffective assistance of counsel claim. *See* Cv. Dkt. Nos. 21, 29, 33.

Jane Doe 1 stated that she began communicating with Cox when she was 12 years old, and he was 15 years old. *Id.* at 3. At some point during their correspondence, they began exchanging videos and photos. *Id.* Jane Doe 1 claimed that she had to continue sending "images/videos of herself" to Cox because he "would threaten to send the pictures out to everyone [Jane Doe 1] knows" if she stopped. *Id.* Jane Doe 1 confirmed that some of the images were sent to a male neighbor who she was dating prior to 2019. *Id.* Although she did not know which images were sent, nor the dates they were sent, she learned about them being sent "because the guy showed them to [Jane Doe 1]'s sister to alert her of what he had been [sic] sent." *Id.*

While it is undisputed that the images and videos seized from Cox's phone in 2019 were sexually explicit, the ROI does not specifically characterize the images Cox sent to the former boyfriend (the distributed images) as sexually explicit. The first page of the ROI reports that, "According to [Tom Green Sheriff's Office] Cox not only possessed child pornography but was also communicating with a minor in New Jersey [Jane Doe 1] and instructing the minor to produce child pornography on his behalf." *Id.* at 2. At one point in the interview, the agent reported:

> [Jane Doe 1] was then shown several photographs taken from Cox's device(s) that depicted [Jane Doe 1] as well as some that depicted both [Jane Doe 1] and Cox through a video chat or collage of photographs. [Jane Doe 1] viewed several of these images and identified herself in every image and that of Cox. [Jane Doe 1] became emotional when she was shown images of her nude body and stated they were Cox's idea.

*Id*. at 3. It also appears undisputed that the images the agent showed Jane Doe 1 during the

interview were those seized from Cox's phone during the 2019 search and did not contain the distributed images.

### B.    Indictment, plea, and Presentence Report (PSR)

A grand jury indicted Cox on May 13, 2020, in a four-count Indictment charging him with two counts of Production of Child Pornography in violation of 18 U.S.C. § 2251(a) and two counts of Enticement of a Minor in violation of 18 U.S.C. § 2422(b). Cr. Dkt. No. 1. Both production counts and one of the enticement counts relate to Jane Doe 1, while the second enticement count relates to Jane Doe 2. *Id*. Two of the 74 videos found on Cox's phone were the subject of Counts One and Two of the indictment. *Id*. at 1–3. Cox made his initial appearance in federal court on May 18, 2020, at which time Fred C. Brigman was appointed as his counsel under the Court's Criminal Justice Act Plan. Cr. Dkt. No. 8.

Cox later entered into a plea agreement with the Government and pleaded guilty before the undersigned to Count One of the Indictment charging him with Production of Child Pornography in violation of 18 U.S.C. § 2251(a). *See* Cr. Dkt. Nos. 28, 34. Again, the victim in Count One was Jane Doe 1. As part of his Plea Agreement, Cox waived his right to appeal or otherwise challenge his sentence but reserved the right to bring an appeal for "a sentence exceeding the statutory maximum punishment, . . . an arithmetic error at sentencing," challenges to the voluntariness of his guilty plea or the waiver of the right to appeal, and "to bring a claim for ineffective assistance of counsel." Cr. Dkt. No. 28 at 6–9.

As part of his plea, Cox admitted through his Factual Resume to "demanding nude photographs of Jane Doe 1" and to sending "nude" images to Jane Doe 1's former boyfriend. Cr. Dkt. No. 30 at 4. All other references in the Factual Resume to images and videos of Jane Doe 1 that were created and sent between Cox and Jane Doe 1 at his direction describe the images and videos as "sexually explicit." *See id.* Specifically, Cox's Factual Resume stipulates, in relevant part:

. . .

2.      On or about May 1, 2020, and in connecting [sic] with another investigation, investigators with the Tom Green County Sheriff's Office (TGCSO), seized a cellular telephone belonging to Joshua Paul Cox, who had admitted that there would be images and videos of child pornography on his phone. Cox gave law enforcement consent to search his cellular telephone. When investigators searched Cox's phone, they found numerous *sexually explicit* images and videos of a minor female who Cox identified as "Jane Doe 1" and whom he believed was younger than 18 years old. In total, there were 658 images and 74 videos of "Jane Doe 1" engaging in *sexually explicit* conduct from August 1, 2018, to April 26, 2019. Each of these images and videos met the definition of "child pornography" under federal law. "Jane Doe 1" was subsequently identified as a minor student at Millville Senior High School in Millville, New Jersey.

3.      On May 24, 2019, investigators contacted Jane Doe 1's mother, who stated that her daughter had initially been contacted by Cox when Doe was 15 years old. Cox demanded *nude* photographs of Jane Doe 1 and coerced her to provide the *sexually explicit* photographs by threats of physical violence. The mother had contacted the Millville Police Department regarding Cox and they, in turn, contacted the San Angelo Police Department, who warned Cox to cease contact with Jane Doe 1 and her family.

4.      On October 15, 2019, Jane Doe 1 was interviewed. She stated that in 2015, she moved to New Jersey to live with her mother. Thereafter, she began an online relationship with Cox. She stated that when she was 15 or 16, Cox became a "monster" and that he began manipulating her by threatening to kill

himself. Doe did not remember when she began sending the *sexually explicit* photographs to Cox, but that once it started, she could not stop because Cox threatened to send the photographs to her family and friends. Cox sent *nude* images of Doe to a boy who lived across the street from Jane Doe l because Doe was dating him. Jane Doe 1 stated that Cox told her he had "people" watching her, which scared her.

. . .

*Id.* at 3–4. (emphasis added).

Cox's Factual Resume also incorporates the definition of "sexually explicit conduct" found in the statute which includes, among other things, the "lascivious exhibition of the genitals or pubic area of any person[.]" *Id.* at 2; 18 U.S.C. § 2256(2)(A). But the Factual Resume supplements the statutory definition of "sexually explicit conduct" with the following admonition:

> Be cautioned that not every exposure of the genitals or pubic area constitutes lascivious exhibition. Whether a visual depiction constitutes such a lascivious exhibition requires a consideration of the overall content of the material. You may consider such factors as whether the focal point of the visual depiction is on the child's genitalia or pubic area; whether the setting of the depiction is sexually suggestive, that is, in a place or pose associated with sexual activity; whether the child is depicted in an un- natural pose or in inappropriate attire, considering the age of the child; whether the child is fully or partially nude; whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; or whether the depiction is designed to elicit a sexual response in the viewer. This list is not exhaustive, and no single factor is dispositive.

Cr. Dkt. No. 30 at 2.[3]

---

[3] This statement is apparently borrowed from the Fifth Circuit Pattern Jury Instructions. *See* PATTERN JURY INSTRUCTION 2.84, SEXUAL EXPLOITATION OF CHILDREN — PRODUCING CHILD PORNOGRAPHY, FIFTH CIRCUIT DISTRICT JUDGES ASSOCIATION PATTERN JURY INSTRUCTIONS COMMITTEE, *PATTERN JURY INSTRUCTIONS, CRIMINAL CASES* (2019).

The undersigned conducted Cox's rearraignment on March 3, 2021, and entered a report recommending that United States District Judge James Wesley Hendrix accept Cox's guilty plea. Cr. Dkt. No. 35. On March 17, 2021, Judge Hendrix accepted the recommendation and adjudged Cox guilty of Production of Child Pornography in violation of 18 U.S.C. § 2251(a). Cr. Dkt. No. 36. That same day, Judge Hendrix ordered the preparation and disclosure of a presentence report (PSR). Cr. Dkt. No. 37 at 1.

On April 29, 2021, the United States Probation Officer (USPO) submitted the PSR which reflected a Base Offense Level of 32. Cr. Dkt. No. 38-1 at 11. Additionally, the PSR included recommendations for the application of three Specific Offense Characteristics enhancements. *Id*. at 11–12. First, the PSR recommended a 2-level enhancement under USSG § 2G2.1(b)(2)(A) because the offense of conviction involved the commission of a sexual act or sexual contact, *i.e.*, inducing Jane Doe 1 to record a video of herself masturbating. *Id*. at 11.

Second, the PSR recommended a 2-level enhancement under USSG § 2G2.1(b)(3) for Cox knowingly engaging in distribution of sexually explicit visual or printed material. *Id*. This is the enhancement at issue in Ground Two of Cox's Amended Motion. In recommending the application of this enhancement, the PSR states:

> 40. Specific Offense Characteristics: Pursuant to USSG §2G2.1(b)(3), if the defendant knowingly engaged in distribution, increase by 2 levels. In his Factual Résumé, the defendant admitted to sending the *sexually explicit* images of [Jane Doe 1] to a male that [Jane Doe 1] was dating and who lived across the street from [Jane Doe 1].

*Id.* (emphasis added).

Third, the PSR recommended a 2-level enhancement under USSG § 2G2.1(b)(6)(B)(i) because the offense of conviction involved "the use of a computer or an interactive computer service to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct." *Id*. at 11–12.

The PSR also recommended adding 5 levels under USSG § 4B1.5(b)(1) for Cox being a repeat and dangerous sex offender against minors. *Id*. at 12. And finally, the PSR recommended subtracting 3 levels for Cox's acceptance of responsibility under USSG § 3E1.1(a) and (b). *Id.*

Thus, Cox's total offense level was 40. *Id*. When combined with Cox's Criminal History Category of II, the PSR's Guideline Imprisonment Range was 324 to 360 months. *Id*. at 19.

## C.      The enhancement currently challenged by Cox

As explained above, in addition to claiming that Brigman failed to file a notice of appeal or consult him on the filing of a notice of appeal (Ground One), Cox challenges the application of the sentencing enhancement in USSG § 2G2.1(b)(3) on two bases (Ground Two); *i.e*., specifically, that the Government did not and could not prove the images were sexually explicit and even if it could, the distribution of those images in 2015 was not relevant conduct.

USSG § 2G2.1(b)(3) and (6) provide:

9

§ 2G2.1. Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production

(a) Base Offense Level: 32
(b) Specific Offense Characteristics
    (1) . . .
    (2) . . .
    (3) *If the defendant knowingly engaged in distribution, increase by 2 levels.*
    (4) . . .
    (5) . . .
    (6) If, for the purpose of producing sexually explicit material or for the purpose of transmitting such material live, the offense involved (A) the knowing misrepresentation of a participant's identity to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage sexually explicit conduct; or (B) the use of a computer or an interactive computer service to (i) persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct; or (ii) solicit participation with a minor in sexually explicit conduct, increase by 2 levels.

U.S. Sentencing Guidelines Manual § 2G2.1. (emphasis added).

The parties agree the Factual Resume and PSR refer to the same, single instance of distribution, that of Cox sending an image or images to Jane Doe 1's former boyfriend. Cv. Dkt. No. 49 at 6. The parties further agree there are only two sources of information for that distribution *in the pre-conviction record. Id.* at 6–7. One is Cox's admission in the Factual Resume that he "sent nude images of Doe to a boy who lived across the street[.]" *Id.*; Cr. Dkt. No. 30 at 3–4; Cv. Dkt. No. 49 at 7. The second is the summary of an HSI agent's interview of Jane Doe 1, noted above, that reports she "stated that on one occasion

Cox sent some of the images/videos, although [she] did not know which ones, to a guy she used to date that lived across the street." Cv. Dkt. No. 14-1 at 3.

Pertaining to the sexual explicitness of the distributed images, the HSI report does not describe the content of the images sent by Cox to the former boyfriend, nor does it specifically describe the universe of images/videos the distributed images were sent from. While the subject of the agent's interview of Jane Doe 1 involved "images and videos found on devices belonging to Joshua Cox," the parties appear to agree that whatever images Cox sent to the boyfriend were not among those found on his phone post-arrest. *Id.*; *See* Dkt. No. 49. And again, the HSI report does not specifically describe the distributed images as "sexually explicit." Cv. Dkt. No. 14-1. Rather, the agent appears to use the term "nude" as a synonym for "sexually explicit" because he refers to the images/videos found on Cox's phone—indisputably "sexually explicit"—simply as "nude," and later clarifies that Jane Doe "estimated that she had sent Cox between 50-100 images/videos (nude and non nude) . . . ." *Id* at 4. Cox testified that he and Jane Doe 1 exchanged a variety of photos in addition to those that were sexually explicit, including nude images that were not sexually explicit and non-nude images. Cv. Dkt. No. 49 at 19.

Pertaining to both sexual explicitness and relevant conduct, neither the Factual Resume, the PSR, nor the agent's summary of Jane Doe 1's interview provides a date Cox sent the images to the former boyfriend. The parties agree the only recorded source for that date is Cox's post-conviction claim that he sent the image(s) in 2015. *Id.* at 7, 20. Cox testified at his § 2255 hearing that he sent them in November of 2015 and that they depicted

11

Jane Doe 1 "in her bra from the waist to her neck," but did not depict her genitals. *Id.* at

20, 39, 52.

### D.    Objections to PSR and Cox's sentencing

Cox's trial attorney, Brigman, timely filed three objections to the PSR. Cr. Dkt. No.

43. First, Brigman objected to paragraph 40 of the PSR

> because it grants a two-level increase pursuant to USSG §2G2.1(b)(3) for
> knowingly engaging in distribution. Defendant contends his conduct does not
> amount to distribution because he did not make the image of victim [Jane
> Doe 1] available through a file-sharing website or peer-to-peer networks for
> public viewing which is typically common of child pornographers.
> . . .
> Defendant sent the image of victim [Jane Doe 1] to a male that [Jane Doe 1]
> was dating, but he did not post it on a public website for public viewing. As
> such, the two-level enhancement is not warranted.

*Id*. at 1.

Second, Brigman objected to paragraph 41 of the PSR because:

> [t]he two-level increase for use of a computer is not warranted because the
> use of a computer or electronic device is an element of the offense.
> Additionally, child pornography guidelines were drafted by Congress before
> the use of palm held computers and electronic devices became so ubiquitous.
> As such, including this enhancement amounts to double counting.

*Id*. at 2.

Brigman's third objection to the PSR consisted of an argument for a downward

variance based on Cox's young age, his mental health history, and that there were only two

victims, both of whom "were only a few years younger than the defendant." *Id*. at 2–3.

The Government accepted the PSR as written and filed no objections. Cr. Dkt. No.

39. And on June 3, 2021, the USPO submitted an Addendum to the PSR addressing the

objections made by Cox's trial attorney but supporting the PSR as originally submitted. Cr. Dkt. No. 46-1.

Cox was sentenced by Judge Hendrix on June 17, 2021. Cr. Dkt. No. 51. Judge Hendrix overruled Cox's objections to the PSR and adopted the PSR and the addendum's factual findings and legal conclusions. Cr. Dkt. No. 61 at 6–7. The resulting advisory guideline range was 324 to 360 months imprisonment. *Id.* at 7. After considering the sentencing factors under 18 U.S.C. § 3553(a), Judge Hendrix determined that a 324-month term of imprisonment was appropriate and imposed sentence. *Id.* at 14; Cr. Dkt. No. 52.

### E.    Testimony of Cox during August 18, 2022, evidentiary hearing

The undersigned conducted a hearing on Cox's § 2255 Amended Motion on August 17, 2022. Cox testified that he began communicating with Jane Doe 1 when she was 12 and he was 15. Cv. Dkt. No. 49 at 18. According to Cox, they stayed in touch for seven years and would "send pictures back and forth, videos back and forth of each other masturbating," but some of the photos were neither nude nor depicted sexual activity. *Id.* at 18–19. Cox testified that a nude picture is one that shows a person "undressed." *Id.* at 18.

When asked about the images he sent to Jane Doe 1's boyfriend, Cox testified he sent the photos in November of 2015 and that the photos showed Jane Doe 1 "in her bra from the waist to her neck." *Id.* at 20, 39, 52. Cox says his attorney, Brigman, never asked him what Jane Doe 1 was doing in the images he sent, when he sent them, or what parts of her body were depicted in the images. *Id.* at 20. And Cox acknowledges that he never

told Brigman what the images depicted or that they were sent years before the dates of the images found on Cox's phone in 2019. *Id.* at 37–38. Cox testified that he destroyed the phone used to distribute the images after becoming angry with a family member, thus the images are no longer available. *Id.* at 21. Cox claims the phone seized by the Government, and which contained the images and videos that form the basis of Cox's indictment, was not the same phone he used to send images/videos that are the subject of the § 2G2.1(b)(3) distribution enhancement at issue here. *Id.* at 21.

Cox testified that he met Fred Brigman the day he got indicted. *Id.* at 23. During their second visit at the jail, Cox spoke with Brigman about his potential plea agreement. *Id.* at 26. Cox claims he was angry about the plea agreement at the time. *Id.* However, because he feared receiving a longer sentence, Cox later decided he wanted to plead guilty. *Id.* at 31. Cox testified that when he signed the plea agreement, Brigman summarized the waiver of appeal section. *Id.* at 32.

Cox testified that when he heard his sentence announced, he was unhappy about receiving 324 months of incarceration. *Id.* at 34. He claims that he turned to Brigman before being "dragged" out of the courtroom and said, "I want an appeal." *Id.* at 34. Cox claims to have called Brigman when he got back to jail but was unable to speak with him or anyone at his office. *Id.* at 35–36. After failing to contact Brigman, Cox testified that he told his mother to contact Brigman so they could figure out how to appeal. *Id.* at 36. Despite his inability to contact Brigman by telephone, Cox claims he did not write to Brigman about appealing because he believed he could not write anyone within the judicial system

14

directly.[4] *Id.* at 46–47. Cox testified that as far as he knew, his mother was never able to contact Brigman. *Id.* at 47–48.

Regarding the images of Jane Doe 1, Cox testified that he received a variety of photos, including nudes, non-nudes, and nudes that did not depict sexual conduct. Cv. Dkt. No. 49 at 19. He testified that he never discussed the content of the distributed images with Brigman, *id*. at 25, 31, 33, but they did go over the PSR:

> Q. (by Cox's counsel): Have you ever seen your presentence report or had it read to you?
> A. Yes, I've seen it.
> Q. Do you remember when that was?
> A. In 2021.
> Q. Okay. Was that during a meeting, or in the mail, or--
> A. That was during a meeting--
> Q. Okay.
> A. --at the jail.
> Q. Who was the meeting with?
> A. Brigman.
> . . .
> Q. Okay. Did he summarize that to you or read it to you?
> A. He summarized what was in the PSR.
> Q. Other than summarizing the parts about sending pictures, did he ask you any more facts about the pictures that you sent to the boy across the street?
> A. No, he did not.
> Q. Did he ever ask you to describe what was in those pictures?
> A. No, he did not.
> Q. Would you have told him if he asked?
> A. Yes, I would have.
> Q. Would you have told him when you sent it if he asked?
> A. Yes, I would have.
> Q. Did he ask when?
> A. No, he did not.

---

[4] Cox sent a letter directly to Judge Hendrix in June 2020 and was informed by the Court that he could not write the Judge directly. Cr. Dkt. No. 49 at 26–28. According to Cox, this led him to believe he would also be unable to write a letter directly to his attorney. *Id.* at 46–47.

*Id*. at 33–34.

On cross examination, Cox testified that Brigman went over the Factual

Resume with him:

> Q. (by Government's counsel): And as part of that guilty plea, you submitted to the Court a factual resumé?
> A. Yes, I did.
> . . .
> Q. And Mr. Brigman went over that factual resumé with you, didn't he?
> A. Yes.
> Q. He went through it?
> A. Yes, he did.
> Q. He asked you if everything in it was true?
> A. Yes, he did.
> Q. Including sending nude images of your victim?
> A. Yes.
> Q. And when he was going through that, you didn't stop him and say, hey, those weren't nude images?
> A. No, I did not.
> Q. You didn't stop him and say, hey, I sent that years ago?
> A. No, I did not.
> Q. You just told him, yes, that's true, I did that?
> A. Yes.
> Q. So let's talk about the nude images that you sent of Jane Doe.
> A. Okay.
> Q. You got them from Jane Doe, didn't you?
> A. Yes.
> Q. You got them by asking her for them, didn't you?
> A. Yes.
> Q. And they were images that were sent to you for sexual gratification, weren't they?
> A. No, they weren't.

*Id*. 37–38. And as to the content of the distributed images, Cox testified:

> Q. The images that you sent to her neighbor, did they show your victim's genitals?
> A. No.
> Q. They didn't?

A. No.
Q. What did they depict?
A. They--it was a picture of her in her bra from the waist to her neck.
Q. But you didn't tell Mr. Brigman that?
A. No, I did not.
Q. You didn't tell him what your definition of "nude" was?
A. No, I did not.
Q. And, of course, you didn't have those pictures, did you?
A. No.

*Id.* at 39.

Pertaining to the date he sent the images to Jane Doe 1's former boyfriend,

Cox testified on direct examination:

> Q. (by Cox's counsel): Okay. Now, how clear in your mind is it that you sent those pictures in 2014 or 2015?
> A. Very clear.

*Id.* at 52.

### F.    Testimony of Brigman during August 18, 2022, evidentiary hearing

Brigman also testified at Cox's § 2255 hearing. He was appointed to represent Cox

in May of 2020 and his representation continued through the notice-of-appeal period. *Id.*

at 55. According to Brigman, Cox decided to plead guilty because he did not want to be

sentenced to 50 years in prison. *Id.* at 77. After Cox's sentence was announced at his

sentencing hearing, Brigman says Cox was immediately removed from the courtroom, but

Brigman told him as he was being led out, "I'm going to try to see you downstairs, but if

I can't, call me." *Id.* at 64.

Brigman testified that Cox never told him that he wanted to appeal after being

sentenced, and that he never received a call from Cox concerning his appeal. *Id.* at 85.

Brigman spoke with Cox's mother on the phone after the sentencing hearing, but Brigman said that she never mentioned appealing and called only to ask where Cox was being sent after being sentenced. *Id.* at 86. Brigman told Cox's mother to have Cox call him once she contacted him. *Id.* When asked whether the staff at Brigman's office would have informed him about a missed called from Cox or his mother, Brigman testified they would have. *Id.* at 87. Brigman testified that had Cox or his mother asked him to file an appeal, he would have filed a notice of appeal, even if the time to do so had expired. *Id.* at 88.

When discussing Cox's sentencing enhancement, Brigman testified that nothing in his file on Cox identifies or describes the images Cox sent to Jane Doe 1's former boyfriend:

> Q. (by Cox's counsel): Mr. Brigman, speaking of what Mr. Cox agreed to in the factual resumé, Mr. Cox agreed they were nude pictures. Correct?
> A. Yeah.
> Q. So he did not agree that they were sexually explicit pictures. Correct?
> A. He didn't specifically say that.
> Q. Okay. Thank you. Mr. Brigman, was there anything in your file, including the government's discovery, that identified the pictures distributed?
> A. I don't believe so.
> Q. Was there anything in the file that identified when those pictures were distributed?
> A. At this point, I don't remember.
> Q. I'm sorry?
> A. I would say no, but I don't--I don't really remember if there was anything that identified them or not.
> Q. Okay. Was there anything in the file that described what Jane Doe was or was not doing in those pictures?
> A. The ones that were distributed? Is that what you're talking about?
> Q. Yes, sir.
> A. No.

*Id*. at 73–74. But Brigman testified he had no reason to believe the distributed images differed from the sexually explicit images and videos found on Cox's phone in 2019 and which he admitted possessing. *Id.* at 79–80.

Brigman agrees the enhancement at issue here requires a distribution of sexually explicit photos, and that Cox's Factual Resume states that Cox "sent nude images" to the former boyfriend:

> Q. (by Cox's counsel): Mr. Brigman, in the PSR, what terminology was used to describe the photographs?
> A. Sexually explicit images.
> Q. And in the factual resumé, what terminology was used to describe the photographs?
> . . .
> A. Okay. It just says--it said images. Just says images.
> Q. (BY MS. FENWICK) Does it say nude images?
> A. Just one second.
> Q. That Mr. Cox sent nude images of Doe to a boy who lived across--
> A. Yes. Sent nude images of Doe to a boy who lived across the street from Jane Doe 1 because Doe was dating him.
> Q. Okay. And just as a matter of plain language, you would agree nude and sexually explicit are different terms. Correct?
> A. Yes.

Cv. Dkt. No. 49 at 68–69.

> Q. Okay. Mr. Brigman, is every nude picture a sexually explicit picture?
> A. No, I guess not.
> Q. All right. Does every nude picture of a minor constitute child pornography?
> A. No.
> Q. And, in fact, the factual resumé which you signed cautions that not every nude picture is sexually explicit. Correct?
> A. Yeah.

*Id*. at 70; *see also id*. at 65–67.

Q. Okay. And just to be clear, in the factual resumé, Mr. Cox admitted to sending nude pictures. Correct?
A. That's correct.
Q. Okay. So Mr. Cox, in the factual resumé, did not admit to sending sexually explicit pictures. Correct?
A. That's correct.
Q. Okay. Is there anything--there's nothing in that factual resumé that says that Doe's distributed pictures were ever collected in evidence. Correct?
A. That's correct.
Q. You said you went to the AUSA' s office and you reviewed the discovery in this case. Did what you review identify the distributed pictures?
A. No.
Q. And, Mr. Brigman, turning back to the factual resumé for just a moment, you agreed that the factual resumé itself cautions that not every nude picture is a sexually explicit picture. Correct?
A. Yes.

*Id*. at 90. But Brigman still chose not to object to the enhancement on the basis the distributed images were not sexually explicit. Brigman instead chose to object "on the basis that the distribution in the case did not constitute distribution" because the images Cox sent were not posted to a public forum. *Id.* at 70.

Pertaining to relevant conduct, when asked whether the timing of the distribution of the images sent to Jane Doe 1's boyfriend mattered for purposes of relevant conduct, Brigman replied "I don't know."[5]

Q. (by Cox's counsel): Turning to what constitutes relevant conduct, for conduct to be counted as relevant conduct for this enhancement, does it have to be criminal conduct?
A. I don't think relevant conduct has to be criminal.
Q. Does the timing of the distribution of these pictures matter to whether it's relevant conduct?
A. It--I don't know.
Q. Okay.

---

[5] As discussed in greater detail below, a defendant's conduct must qualify as relevant conduct to receive a sentence enhancement.

*Id.* at 70–71. In explaining his decision to not object to the distribution enhancement based on relevant conduct, Brigman testified, "the problem I had with pushing the envelope on the objection on that, [Cox] admitted to it in the factual basis, and I did not want to chance him losing acceptance of responsibility." *Id.* Ultimately, although Brigman agrees that Cox did not specifically state the images he sent to the boyfriend were sexually explicit, Brigman did not want to push back on facts Brigman believed Cox admitted in his Factual Resume because he feared doing so would jeopardize Cox's acceptance of responsibility. *Id.* at 73.

Brigman testified that objections based on the images not being sexually explicit or not constituting relevant conduct would have been "frivolous." *Id.* at 81. He testified:

> Q. (by Government's counsel): [Cox] says you should have objected because they weren't sexually explicit images?
> A. Yes.
> Q. He says you should have objected because it wasn't relevant conduct?
> A. Yes.
> Q. What do you think of those claims?
> A. I think they are frivolous. I mean, he--in the factual basis, he admitted to the conduct. I didn't see any--when I went up and looked--and it's been a long time. But when I went up and looked at the images, I didn't see anything that wasn't sexually explicit.

*Id.* According to Brigman, he was concerned that making an objection on these bases could be perceived as denying conduct admitted in the Factual Resume and, in his experience, a defendant risks losing acceptance points in that situation even if the objection might otherwise be merited. *Id.* at 82.

Brigman testified that he explained to Cox all the documents that were included in

his plea deal, including the Factual Resume, Plea Agreement, and waiver of appeal:

> Q. (by Government's counsel): Now, we've spoken about this. As part of his plea, Mr. Cox filed a factual resumé. Right?
> A. That's correct.
> Q. And in that factual resumé, he admitted that he sent nude images of one of his victims to her neighbor?
> A. Yes.
> Q. And he did it because he was mad that she was dating the neighbor?
> A. Correct.
> Q. He did it to embarrass her. Right?
> A. Yes.
> Q. Did you go over that particular admission with Mr. Cox?
> A. Oh, yeah. I read the entire factual resumé to him, and the plea agreement and everything.
> Q. Did he stop you and say, hey, Fred, those weren't nude images?
> A. No.
> Q. Hey, Fred, I've got a weird definition of nude; you need to know what it is?
> A. No.
> Q. He said--he didn't say, hey, Fred, that was years ago?
> A. No.
> Q. Now, also in that factual resumé, did Mr. Cox admit to possessing over 600 sexually explicit images of Jane Doe 1?
> A. Yes.
> Q. And over 70 videos, sexually explicit videos of Jane Doe 1?
> A. Yes.
> Q. And did you see some of those images and videos in preparation for this case--I'm sorry--in preparation for Mr. Cox's original trial?
> A. Yes. I went to the U.S. Attorney's Office and, you know, made sure it was child pornography.
> Q. And was it child pornography?
> A. Sure looked like it to me.
> Q. Did you have any reason to believe that the nude images that Mr. Cox sent to Jane Doe's 1 neighbor were any different than the 600 sexually explicit images he had on his phone?
> A. No.

*Id*. at 79–80; *see also id*. at 63–64.

## II.    LEGAL STANDARDS

Cox asserts that Brigman rendered ineffective assistance of counsel under the Sixth Amendment when he failed to file a notice of appeal and when he failed to make certain objections to the sentencing enhancement. Sixth Amendment ineffective assistance of counsel claims are evaluated under the two-prong test set by the Supreme Court in *Strickland v Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Court held that criminal defendants have a Sixth Amendment right to "reasonably effective" assistance of counsel. 466 U.S. at 687. Under the *Strickland* test, a defendant claiming ineffective assistance of counsel must show (1) that defense counsel's performance was deficient and (2) that this deficient performance in fact prejudiced the defendant. *Id.* Deficient performance is shown if counsel's "representation fell below an objective standard of reasonableness." *Id.* at 688.

In assessing an attorney's performance, courts are highly deferential and indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Lagos*, 25 F.4th 329, 334, 334 (5th Cir. 2022) (quoting *Strickland*, 466 U.S. at 689)). This means "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy' because '[t]here are countless ways to provide effective assistance in any given case.'" *Strickland*, 466 U.S. at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).

To demonstrate prejudice, a defendant "must show that there is a reasonable

23

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In applying the test, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. The *Strickland* analysis applies "in federal collateral proceedings." *Id*. (applying the test in a federal habeas action under 28 U.S.C. § 2254).

## III.    DISCUSSION AND ANALYSIS

Cox alleges two grounds for relief in his Amended Motion to Vacate, both of which he claims demonstrate performance on Brigman's part that fell below *Strickland*'s objective standard of reasonableness, and which prejudiced him. Cv. Dkt. Nos. 23 at 7; 24 at 4–10. First, Cox argues that Brigman "failed to consult Cox regarding filing an appeal after sentencing and completely ignored Cox's instructions to file an appeal." Cv. Dkt. No. 23 at 7. Second, Cox argues that Brigman "was prejudicially ineffective for failing to challenge the 2-level adjustment in USSG 2G2.1(b)(3) on the appropriate grounds, namely the absence of any evidence that the distributed images contained sexually explicit conduct under 18 U.S.C. § 2256, and were not relevant conduct with respect to count one." *Id.* The undersigned considers these grounds in reverse order.

**A.    Failure to challenge the adjustment in USSG § 2G2.1(b)(3) on the grounds that there was insufficient evidence the distributed images contained sexually explicit conduct under 18 U.S.C. § 2256 and were not relevant conduct with respect to count one.**

1.    *"Nude" versus "sexually explicit"*

Cox argues that "[e]ffective representation requires that counsel object to prejudicial misapplication of the Guidelines." Cv. Dkt. No. 24 at 5. He believes that § 2G2.1(b)(3) was misapplied to him and that an objection on that basis "could have rectified that error." *Id*. Specifically, Cox states that he "received two levels for images he sent to the 'guy [the victim] used to date across the street.'" *Id*. But, he urges, "[t]here is no evidence in the record, and none in Mr. Brigman's case file, that the images depicted 'sexually explicit conduct' under 18 U.S.C. § 2256." *Id*. Cox points out that neither the PSR nor the HSI agent's report on Jane Doe 1's interview describes what the distributed images depicted. *Id*. "In the absence of this showing, the distribution enhancement is plainly inapplicable" because "Fifth Circuit precedent requires that the defendant's conduct be criminal in order to increase the defendant's offense level under Chapter 2." *Id*. at 5–6. And because the Government could not prove the images' content was criminal, *i.e.*, sexually explicit, § 2G2.1(b)(3) cannot be used to punish the distribution of those images. *Id*. at 6.

The Government responds by arguing that Cox admitted the distributed images "were of his nude minor victim." Cv. Dkt. No. 31 at 5. "And the PSR explicitly cited this admission in support of the distribution enhancement." *Id*. The Government argues that "Cox has offered here no rebuttal evidence with which [Brigman] could have challenged

the PSR's correct application of the enhancement." *Id*. The Government concludes that "[w]here, as here, a defendant is 'faced with facts contained in the PSR that are supported by an adequate evidentiary basis with sufficient indicia of reliability, [he] must offer rebuttal evidence demonstrating that those facts are materially untrue, inaccurate, or unreliable.'" *Id*. (quoting *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012)).

In reply, Cox argues that the Government attempts to equate the admittedly "nude" images with images that are "sexually explicit" or that reflect a "lascivious exhibition of the genitals." Cv. Dkt. No. 32 at 10. "But 'nude' photographs are neither 'sexually explicit conduct' nor 'lascivious exhibition of the genitals," Cox insists. *Id*. "That is the precise, binding holding in *United States v. Steen*, 634 F.3d 822[, 826] (5th Cir. 2011)." *Id*. The Government's efforts to equate "nude" with "sexually explicit" or "lascivious exhibition of the genitals" must fail, Cox urges, because "there is absolutely no reason in the record to infer that the content of the distributed images met the definition of 'lascivious exhibition.'" *Id*. at 11.

The undersigned disagrees.

Cox's attempt to lift from its context a narrow finding from *Steen* and apply it here by analogy fails. *Steen* involved a defendant's conviction on one count of production of child pornography based on a single 15-second surreptitious video of a nude minor at a tanning salon. *United States v. Steen* 634 F.3d 822, 824 (5th Cir. 2011). Of that fifteen seconds, the 16-year old victim's pubic region was visible in a portion of the frame for approximately 1.5 seconds. *Id*. After his arrest, "a forensic examination of Steen's

computers found multiple *adult* pornographic images but no images of children." *Id.* at 825. With this context, the Fifth Circuit concluded that "Steen clearly used [the minor victim] for the purposes of producing a nude video, but [18 U.S.C. § 2251(a)] requires more—the film must depict sexually explicit conduct." *Id.* at 826.

The Fifth Circuit in *Steen* discussed the six-factor test for lasciviousness set out in *United States v. Dost*, and adopted by this circuit.[6] *Id.* The Fifth Circuit explained that the *Dost* factors "[are] not exhaustive, and no single factor is dispositive." *Id.* (quoting *United States v. Grimes*, 244 F.3d 375, 380 (5th Cir. 2001)). While noting that the *Dost* factors "have never been deployed where a defendant's conduct said to be criminal under the statute at issue proved to be no more than voyeurism," the Fifth Circuit found the evidence against Steen was "insufficient to find a lascivious exhibition of the genitals." *Id.* at 827.

Critically, Steen's prosecution was based on *a single surreptitiously recorded nude image—and no sexually explicit images—of the minor victim*. In contrast, Cox admitted to possessing "658 images and 74 videos of 'Jane Doe 1' engaging in sexually explicit conduct" which "met the definition of 'child pornography' under federal law." Cr. Dkt. No. 30 at 3. Cox admitted the truth of the Factual Resume's statement that he "coerced [Jane Doe 1] to provide sexually explicit photographs by threats of violence." *Id.* And the

---

[6] *See* 636 F.Supp. 828, 832 (S.D. Cal. 1986), aff'd 813 F.2d 1231 (9th Cir. 1987). These factors are: 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area; 2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity; 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; 4) whether the child is fully or partially clothed, or nude; 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; 6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

disputed admission that Cox sent "nude" images must be read in context. Paragraph 4 of

the Factual Resume addresses the distributed images and that paragraph stipulates:

> On October 15, 2019, Jane Doe l was interviewed. She stated that in 2015, she moved to New Jersey to live with her mother. Thereafter, she began an online relationship with Cox. She stated that when she was 15 or 16, Cox became a "monster" and that he began manipulating her by threatening to kill himself. *Doe did not remember when she began sending the sexually explicit photographs to Cox, but that once it started, she could not stop because Cox threatened to send the photographs to her family and friends. Cox sent nude images of Doe to a boy who lived across the street from Jane Doe l because Doe was dating him.* Jane Doe 1 stated that Cox told her he had "people" watching her, which scared her.

*Id.* at 4. (emphasis added).

As explained above, Brigman testified about viewing the images recovered on

Cox's phone in preparation for trial:

> Q. (by Government's counsel): And did you see some of those images and videos in preparation for this case--I'm sorry--in preparation for Mr. Cox's original trial?
> A. Yes. I went to the U.S. Attorney's Office and, you know, made sure it was child pornography.
> Q. And was it child pornography?
> A. Sure looked like it to me.
> Q. *Did you have any reason to believe that the nude images that Mr. Cox sent to Jane Doe's 1 neighbor were any different than the 600 sexually explicit images he had on his phone?*
> A. *No.*

Cv. Dkt. No. 49 at 79–80. (emphasis added).

And when asked what he thought of the objections Cox now thinks he should have

made, Brigman characterized them as "frivolous" because "in the factual basis, he admitted

to the conduct. I didn't see any--when I went up and looked--and it's been a long time. *But*

*when I went up and looked at the images, I didn't see anything that wasn't sexually explicit.*"
*Id*. at 81. (emphasis added).

While the undersigned agrees with Cox that "nude" and "sexually explicit" are not synonymous, they are also not mutually exclusive. An image can be both nude and sexually explicit, and Cox does not argue otherwise. And while the Factual Resume in which Cox admitted to distributing nude images cautioned that not every nude image is sexually explicit, there is no rational basis for either the Government or Cox to include in the Factual Resume a reference to the distribution of a nude image that was not also sexually explicit. And Cox provides no explanation for the inclusion of what he argues, at least by implication, was an otherwise legally benign sentence in a Factual Resume the purpose of which is to provide a factual basis for his plea to producing sexually explicit images and, more specifically, in a paragraph discussing sexually explicit images.

The Court "is permitted to draw reasonable inferences from the facts," and those factual findings will stand a challenge so long as they are "plausible in light of the record as a whole." *United States v. Vera*, 436 F.App'x. 351, 353 (5th Cir. 2011) (citations omitted (internal quotation marks omitted). And while, unlike *Vera*, this case does not present a direct appeal of the Court's application of the enhancement, whether a reasonable inference can be drawn that the distributed images were sexually explicit based on the totality of facts before Brigman informs both whether his failure to object to the enhancement fell below what was objectively reasonable and whether there existed a reasonable probability that, but for that failure, the result of the proceeding would have been different or that the

confidence in the outcome has been undermined. *Strickland*, 466 U.S. at 694. The undersigned FINDS that such an inference was reasonable based on facts of this case, including the sexually explicit nature of the images and videos discovered on Cox's phone and viewed by Brigman.

But Cox insists that "[t]here is no evidence in the record, and none in Brigman's case file, that the images depicted 'sexually explicit conduct' under 18 U.S.C. § 2256." Cv. Dkt. No. 24 at 5. This might be true, but only of direct evidence. Here, there was ample circumstantial evidence that the images depicted sexually explicit conduct that would satisfy the test for being criminal. *Id*. And "[t]he law makes no distinction between the weight to be given either direct or circumstantial evidence." *United States v. Clark*, 506 F.2d 416, 418 (5th Cir. 1975). Even in the absence of direct evidence to support the application of an enhancement, "the sentencing court is permitted to make common-sense inferences from the circumstantial evidence." *United States v. Caldwell*, 448 F.3d 287, 292 (5th Cir. 2006). "[I]n determining whether an enhancement applies, a district court is permitted to draw reasonable inferences from the facts, and these inferences are fact-findings reviewed for clear error" and will be upheld "so long as the enhancement is plausible in light of the record as a whole." *Id.* at 290.

Cox then claims not only that there was no evidence in the record, but that "[t]he government couldn't prove" the images were sexually explicit. Cv. Dkt. No. 24 at 6. Again, the Government was required to establish the images were sexually explicit by a

preponderance. And as explained above, had there been an objection as Cox now argues, there was ample circumstantial evidence the distributed images were sexually explicit.

But putting aside circumstantial evidence, Cox's argument here that, based on the record as it existed at the time, the Government could not prove the images were sexually explicit ignores the reality of Cox's situation. Had Brigman objected to the PSR's recommendation of the enhancement for Cox's distribution of sexually explicit images to Jane Doe 1's former boyfriend, Cox fails to explain what would have prevented the Government from proving, at least by the required preponderance, the images were sexually explicit, even without the aid of circumstantial evidence.

Faced with the objection Cox now urges should have been made, the Court would have given the parties "an adequate opportunity to present information to the court regarding . . . [the disputed sentencing] factor." U.S. SENTENCING GUIDELINES MANUAL § 6A1.3(a). It is clear from the record that the agents interviewed Jane Doe 1 about the distributed images. Cv. Dkt. No. 14-1 at 3. And while the ROI states that she did not know which images were distributed, it does not state she did not know whether they were sexually explicit. And there is no reason to believe that, if challenged on this point, the Government could not have presented evidence of the images' sexually explicit nature either through the agent, through Jane Doe 1, through her sister (to whom the boyfriend showed the images), or through the boyfriend who received the images. Ultimately, any objection by Brigman to the PSR's recommended enhancement on the basis the images

were not sexually explicit may have only served to strengthen the Government's case for application of the enhancement, if not worse.

2.    _Relevant conduct_

Cox also argues that even if the Government could establish that the distributed images' content was sexually explicit, their distribution in 2014 or 2015 would not meet any of the definitions for relevant conduct in § 1B1.3 of the Federal Sentencing Guidelines because (1) the images were distributed "years before the offense of conviction" such that they could not have been distributed in preparation for, during, or to avoid detection for the offense under § 1B1.3(a)(1) or constitute harm resulting from the offense of conviction under § 1B1.3(a)(3); (2) Cox's production offense of conviction is expressly excluded from the application of "common scheme" and "course of conduct" relevant conduct under § 1B1.3(a)(2); and (3) the guideline applicable to Cox's offense of conviction does not specify consideration of any other relevant conduct factor, thus § 1B1.3(a)(4) does not apply. Cv. Dkt. No. 24 at 6–8. Again, the only source available to the undersigned for the date of the images' distribution is Cox's recollection, testified to during his § 2255 hearing, that it occurred in November 2015.

The Government argues that the distributed images were relevant conduct under § 1B1.3(a)(1)(A)'s "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant[.]" Cv. Dkt. No. 31 at 6; U.S.S.G. § 1B1.3(a)(1)(A). The Government finds support for this position in Count One's introductory phrase, "[B]eginning on an unknown date and continuing to on or about

April 26, 2019." *Id.* And because Cox admitted to producing images of Jane Doe 1 during the time alleged in Count One, which he induced or caused her to produce, the Government contends the distribution of the images constituted relevant conduct. *Id.* at 6–7.

In reply, Cox observes that the Government does not appear to challenge Cox's testimony that the distribution occurred in 2015, years before the creation of the images found on Cox's phone during its post-arrest search. Cv. Dkt. No. 32 at 12. Cox further insists that the Government's reliance on the "[b]eginning on an unknown date" phrase in the indictment "suffers from a salient logical flaw: namely, the fact that the offense began at a time unknown to the grand jury does not mean that it went back indefinitely." *Id.* at 14.

Ultimately, the Court must determine whether Cox has shown that, in failing to object to the use of the distributed images as relevant conduct, Brigman's performance fell below an objective standard of reasonableness, and that this failure in fact prejudiced Cox. *Strickland*, 466 U.S. at 687–88. That analysis begins with the offense of conviction.

Cox's offense of conviction—Count One—charged:

Count One
Production of Child Pornography
(Violation of 18 U.S.C. § 225 l(a))
Beginning on a date unknown to the grand jury and continuing to on or about April 26, 2019, in the San Angelo Division of the Northern District of Texas, and elsewhere, Joshua Paul Cox, defendant, did employ, use, persuade, induce, entice, and coerce "Jane Doe I" a minor, to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, that is, FullSizeRender_42, which is a video of a minor female masturbating, knowing and having reason to know that such visual depiction would be transported using any means and facility of interstate and foreign commerce,

knowing and having reason to know that such visual depiction would be transported in and affecting interstate and foreign commerce; using materials that had been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer, that is, an Apple iPhone 6S, Model A1634, FCC: BCG-E2944A.

In violation of Title 18, United States Code, Section 2251(a).

Cr. Dkt. No. 1.

If the Court accepts the undersigned's finding above that the Government could have proved by a preponderance that Cox engaged in criminal conduct by distributing sexually explicit images, then the Court must still consider two additional questions in determining whether Brigman's performance fell below an objectively reasonable standard. First, the Court must consider whether the distribution here constitutes one of the several types of relevant conduct set out in § 1B1.3. Second, if the distribution constitutes relevant conduct, the Court must consider whether the Government could have proved that it was relevant conduct. If the answer to either question is in the negative, a failure by Brigman to object on that basis would have fallen below an objective standard of reasonableness.

As previously stated, § 1B1.3(a)(1)(A) defines relevant conduct as any act "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Here, the distribution potentially fits under two types of relevant conduct, (1) an act committed by Cox "in preparation for" his production offense

of conviction, and (2) an act committed by Cox "during" the production offense of conviction. *See* U.S.S.G. § 1B1.3(a)(1)(A).

### a. In preparation for the offense

"Preparation is defined in the criminal law context as '[t]he act or process of devising the means necessary to commit a crime.'" *United States v. Howard*, 759 F.3d 886, 889 (8th Cir. 2014) (citing BLACK'S LAW DICTIONARY 1301 (9th ed. 2009)). Fifth Circuit jurisprudence suggests that in considering whether a crime was committed "in preparation for" another, the Court considers whether a Defendant intends for the commission of one act to be preparation for another. *United States v. Yerena-Magana*, 478 F.3d 683, 689 (5th Cir. 2007) ("There is no evidence in the record before us that Yerena–Magana intended to commit the drug offense for which he was sentenced at the time he illegally entered the United States."). Additionally, the Court should consider whether the two offenses "harmed different societal interests." *Id.*

The Fifth Circuit in a recent case, *United States v. McGavitt*, held that sexual acts performed with a minor was preparation for the later production of child pornography. 28 F.4th 571, 578. In that case, the Defendant pleaded guilty to possession of child pornography, among other things, and argued that his enhancement for the commission of a sexual act or contact did not meet the definition of relevant conduct. *Id.* at 577–78. The Fifth Circuit upheld the district court's enhancement, stating that:

> According to the indictment, the sexual exploitation offense occurred "[f]rom on or about November 1, 2018, through on or about May 26, 2019[.]" The record contains MV1's statement that on April 11, 2019, McGavitt

> showed up at her church and home and engaged in sexual intercourse with her. Following that encounter, MV1 produced and sent at least three pornographic images at McGavitt's behest. This sequence of events supports a finding that McGavitt committed the "sexual act or sexual contact" at issue "during the commission of" or "in preparation for" his sexual exploitation of MV1, U.S.S.G. § 1B1.3(a)(1)(A), as he demanded that MV1 continue sending him explicit images of herself after he had intercourse with her.

*Id.* at 578.

The undersigned recognizes that the phrase "in preparation for" cannot be read to include all acts committed prior to the charged offense. As cautioned in a Sixth Circuit opinion, later withdrawn and vacated on other grounds, relevant conduct should not be expanded "to include any and all conduct that preceded the offense of conviction, even if that conduct was not done with any intent or purpose to prepare for the offense of conviction." *United States v. Shafer*, 557 F.3d 440, 447–48 (6th Cir. 2009), *opinion withdrawn and vacated*, 573 F.3d 267 (6th Cir. 2009).

When discussing whether the distribution here was made in preparation for his charged offense, Cox concedes, given that the images' distribution preceded the offense of conviction, "[t]his theory would at least be logically possible." Cv. Dkt. No. 24 at 8. However, he goes on to argue that "the record and the case file are devoid of evidence that . . . [Cox], years ago, sent the victim's ex-boyfriend a picture in contemplation of the particular conduct named in Count One." *Id.* Cox states that he has attested to his motive being "a simple act of vengeance," and that "[a]t any rate, the information in the record and the case file didn't offer the government any way to prove" that the distribution was made in preparation for the offense. *Id.*

This argument ignores Cox's stipulation that his victim was unable to stop sending sexually explicit photographs to Cox "*because Cox threatened to send the photographs to her family and friends*." Cr. Dkt. No. 30 at 4. (emphasis added). Although the specific date of this threat is not stated in the record, the fact that it was made is recorded in the agent's interview of Jane Doe 1 in the sentence immediately preceding the agent's recording that "Cox sent some of the images/videos" to a boy she used to date. Cv. Dkt. No. 14-1 at 3. Similarly, in Cox's Factual Resume, presumably drafted using the agent's report, the statement that Cox "threatened to send" sexually explicit photographs to Jane Doe 1's family and friends immediately precedes the statement that he distributed images to the boyfriend.

Thus, it is reasonable to conclude, both now and for Brigman at the time of Cox's sentencing, that Cox's threat of sending sexually explicit images to Jane Doe 1's family and friends was fulfilled by Cox when he distributed images to the boyfriend. The Court finds it unlikely that Brigman could have successfully argued that Cox did not intend for his distribution of Jane Doe 1's images to do anything other than coerce her to continue producing and sending Cox sexually explicit images of herself under continuous threat that Cox would *again* distribute images to her family and friends if she stopped.

Cox's self-serving attestation that he only distributed images of Jane Doe 1 as "a simple act of vengeance," and "not to keep the victim making more videos" lacks credibility when compared to the threats he made to Jane Doe 1 to commit *the exact act he was enhanced for*. *See* Cv. Dkt. Nos. 24 at 8; 22 at 7; 14-1 at 3. Jane Doe 1's interview by

the agent, stipulated to by Cox, provided the Government with ample evidence that, in addition to trying to embarrass Jane Doe 1, Cox intended the distribution of her images to serve as a lesson to her about what happens when she disappoints him. And the societal harm imposed when a defendant produces child pornography is analogous to the harm imposed by a defendant's distribution of sexually explicit images of a minor. *See Yerena-Magana*, 478 F.3d at 689.

The undersigned FINDS that the Government had sufficient evidence to show that the distribution, whenever it occurred, was made "in preparation" for Cox's later coerced extraction from Jane Doe 1 of sexually explicit images, including the one made the subject of Count One. In other words, Cox admitted that he manipulated and threatened Jane Doe 1 into producing sexually explicit images, including threatening to send sexually explicit images of her to her family and friends. He also admitted to sending images that were at least nude to her former boyfriend. The fact that Cox carried out his threat provided the preparation and means necessary for his continued coerced production of sexually explicit images from Jane Doe 1, including the one in Count One. Thus, the Government could have shown that the distribution was in preparation for forcing Jane Doe 1 to produce the image in Count One.

### b. During the offense

Additionally, relevant conduct includes any act "that occurred during the commission of the offense of conviction." U.S.S.G. 1B1.3(a)(1)(A). Cox brushes aside the potential application of this provision by characterizing it as "plainly inapplicable" because

"[t]he distribution conduct occurred years before the offense of conviction." Cv. Dkt. No. 24 at 5–7. He continues that "[t]his excludes any possibility that it was 'during the commission of the offense of conviction[.]'" *Id.* at 7.

In response, the Government argues that:

> Count One of Cox's indictment charged him with producing child pornography [depicting Jane Doe 1] beginning on an unknown date and continuing to on or about April 26, 2019. Cox later admitted to producing images during the time period alleged in the indictment. (CR No. 30 at 3.) Thus, Cox's distribution of Jane Doe 1's images—which he could not have obtained without enticing her to produce—clearly constituted relevant conduct.

Cv. Dkt. No. 31 at 6–7. The Government emphasizes that Count One recites "beginning on an unknown date," thus providing the temporal breadth to capture the distribution as relevant conduct regardless of its date. Cv. Dkt. No. 31 at 6–7.

As explained above, Cox replies that the Government's reliance on an unspecified beginning date in the indictment suffers from a "salient logical flaw" because the fact that the offense began at a time unknown to the grand jury does not mean that it went back indefinitely. Cv. Dkt. No. 32 at 14. He urges that "it does not follow that the production of *any* image at *any* time constituted part of the charge [offense]." *Id.* at 15.

Cox provides no authority for the application of his "salient logical flaw" argument in the context of relevant conduct. But whatever facial appeal this argument possesses, it evaporates when considered in the context of Cox's seven-year continuous victimization of Jane Doe 1. Even accepting as true Cox's § 2255 hearing testimony that the images were distributed in 2015, Cox cannot now complain that, because his victimization of Jane Doe

1 spanned seven years, his earlier harmful acts are not relevant conduct simply because they occurred "years before the offense of conviction." Cv. Dkt. No. 24 at 7. To conclude otherwise would have the perverse effect of rewarding Cox for both the extended duration of his crime, and his ability to avoid detection.[7]

If a reasonable inference can be drawn from the totality of facts that the distributed images were sexually explicit, for reasons explained above, Cox's distribution of those images—particularly in the context of his threats of distribution—supports a finding that the distribution was committed "during the commission of" Cox's later coerced production from Jane Doe 1 of the sexually explicit image in Cox's offense of conviction. This is true for many of the same reasons explained above in support of a finding that the distribution was made "in preparation" for Cox's later coerced extraction of sexually explicit images from Jane Doe 1, including the image in Count One.[8] And while, for reasons urged by Cox, it would have been error for the Court to consider the distribution as part of a "course of conduct" under § 1B1.3(a)(2), Cox provides no authority, and the undersigned can find none, that imposes a strict temporal proximity requirement for relevant conduct under § 1B1.3(a)(1)(A)'s "in preparation for" or "during" an offense provision, particularly in a case like this where the acts at issue involved the same victim, the same type of sexual

---

[7] Although neither party nor the undersigned addresses whether Cox's distribution and threats to distribute may constitute acts "in the course of attempting to avoid detection or responsibility for [the offense of conviction]," Cox's threats to distribute images of Jane Doe 1 would presumably create a strong reluctance on her part to facilitate his detection or his being held responsible.

[8] "In certain cases, a defendant may be accountable for particular conduct under more than one subsection of this guideline. If a defendant's accountability for particular conduct is established under one provision of this guideline, it is not necessary to review alternative provisions under which such accountability might be established." U.S. SENT'G GUIDELINES MANUAL § 1B1.3, cmt. n.2.

exploitation occurring continuously for seven years, a past act of distribution admittedly intended to exact vengeance and embarrassment, and a threat of future similar distribution.

Cox's argument that he was a minor at the time the images were distributed is equally unavailing. "[T]he realm of charged conduct and the realm of relevant conduct for Guidelines purposes are not coterminous," and the Guidelines do not prohibit including as relevant conduct activities that took place when a defendant is a juvenile, provided the activities otherwise meet the test for relevant conduct. *United States v. Hinojosa*, 749 F.3d 407, 415–16 (5th Cir. 2014).

The undersigned FINDS that the Government had sufficient evidence to show that the distribution, whenever it occurred, was made during the offense of conviction in Count One. In other words, the Government could have demonstrated that Cox began sexually exploiting Jane Doe 1 prior to the date the distributed images were sent and continuously exploited her up to and including the facts giving rise to Count One. Cox admitted that he manipulated and threatened Jane Doe 1 into producing sexually explicit images, including threatening to send sexually explicit images of Jane Doe 1 to her family and friends. He also admitted to sending images that we at least nude to her former boyfriend. The fact that Cox carried out his threat to distribute images that were at least nude provided the preparation necessary for his continued coerced production of sexually explicit images from Jane Doe 1, including the one in Count One.

For these reasons, the undersigned FINDS that the Government could have shown that the distribution was an act committed during the offense of conviction.

### 3.    *Reasonableness of Brigman's actions*

Based on the knowledge Brigman had at the time, the Court is unable to conclude that his decision to not object to the distribution enhancement on the bases now urged by Cox was an unreasonable one. Although Brigman testified that nothing in his file described the content of the images Cox sent to Jane Doe's boyfriend, Brigman had no reason to believe the images differed from the 658 sexually explicit images and 74 videos Cox had on his phone and admitted to both possessing and compelling their production from Jane Doe 1. Cv. Dkt. No. 49 at 73–74; 79–80.

Brigman agreed that Cox did not specifically say the distributed images were sexually explicit, but he feared that challenging the PSR on that basis risked Cox losing acceptance of responsibility when considered together with the admissions Cox made in his Factual Resume. *Id*. at 71, 73. Additionally, he explained, "I didn't see any—when I went up and looked—and it's been a long time. But when I went up and looked at the images, I didn't see anything that wasn't sexually explicit." *Id.* at 81. Because of that, he believes the objections now urged by Cox would have been "frivolous." *Id*.

At the time of Cox's plea and sentencing, Brigman knew that Cox had engaged in a seven-year sexually exploitive relationship with Jane Doe 1 beginning at least as early as 2015 and continuing to 2019, and ending then only because of his arrest. *Id.* at 103. He knew that Cox's phone, seized in 2019, contained hundreds of sexually explicit images and dozens of sexually explicit videos that Cox admitted to causing Jane Doe 1 to produce.

*Id.* at 79–80. When Brigman reviewed the images and videos seized from Cox's phone, he did not see any that were not sexually explicit. *Id.* at 81. Although the images and videos on Cox's phone went back only to 2018, Brigman knew—through Cox's admission—that Cox had been demanding sexually explicit images of Jane Doe 1 since at least 2015, which coincided with the year Cox testified that he distributed the images in question.

And Brigman testified that he had no reason to believe, after reviewing the evidence and discussing the Plea Agreement and Factual Resume with Cox, that the distributed images were anything other than like the sexually explicit images found on Cox's phone. *Id.* at 80. Indeed, Brigman's objection to the PSR on the basis that Cox's sending the images to the boyfriend "[did] not amount to distribution because he did not make the image of victim [Jane Doe 1] available through a file-sharing website or peer-to-peer networks for public viewing which is typically common of child pornographers," supports that Brigman—and in all probability Cox who presumably was aware of this objection—believed the distributed images were sexually explicit. *See id.* at 81. Brigman further testified that Cox sent the images to the boyfriend because Cox was angry that Jane Doe 1 was dating him and wanted to embarrass her—which also supports the reasonableness of Brigman's conclusion that the distributed images were sexually explicit. *Id.* at 79.

Although Brigman also knew the Factual Resume described the distributed images as "nude" and not "sexually explicit," he concluded that disputing whether the distributed images were sexually explicit risked Cox losing acceptance of responsibility because such an objection might be perceived to be at odds with Cox's Factual Resume. *Id.* at 73. Considering all the circumstances Brigman faced, his decision to not object on these bases was not objectively unreasonable. To be clear, if instead of possessing hundreds of sexually explicit images and dozens of sexually explicit videos of Jane Doe 1, Cox had possessed a single image or video that was demonstrably merely nude and not sexually explicit, as in *Steen*, Brigman's failure to object to an enhancement based on the distribution of that nude image would have been unreasonable.[9] But that is not the case here.

Courts "must be careful 'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *United States v. Shepherd*, 880 F.3d 734, 741 (5th Cir. 2018) (quoting *Strickland*, 466 U.S. at 690). The sentencing fact at issue here—that the distributed images were sexually explicit—need only be established by a preponderance of the evidence. *See United States v. Johnson*, 648 F.3d 273, 277 (5th Cir. 2011). And "[w]hen making factual findings for sentencing purposes, district courts 'may consider any information which bears sufficient indicia of reliability to support its probable

---

[9] The fact that Cox and Jane Doe 1 claimed to have exchanged images that were not nude does not make Brigman's failure to object less reasonable. Cox admitted that the image he distributed was nude, and Brigman stated that all the nude images he viewed on Cox's phone were sexually explicit.

accuracy.'" *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (quoting *United States v. Solis*, 299 F.3d 420, 455 (5th Cir. 2002)). "Generally, a PSR 'bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations.'" *Id*. (quoting *United States v. Nava*, 624 F.3d 226, 231 (5th Cir. 2010). If the facts in the PSR have "'sufficient indicia of reliability,'" a sentencing judge may adopt facts without more unless the defendant "'present[s] rebuttal evidence or otherwise demonstrate[s] that the information in the PSR is unreliable.'" *Id*. (quoting *United States v. Trujillo*, 502 F.3d 353, 357 (5th Cir. 2007)).

Cox argues that "'[b]ald, conclusionary statements do not acquire the patina of reliability by mere inclusion in the PSR,'" which is a correct statement of the law in this circuit, where the principle applies. Cv. Dkt. No. 32 at 13 (internal quotation marks omitted). But it does not apply here, as the cases cited by Cox demonstrate. Cox relies on several Fifth Circuit cases where the PSRs' recited sentencing facts were merely the conclusory statements of agents or prosecutors that found their way into the PSR, but which had no other factual or evidentiary support in the record.[10]

---

[10] For example, Cox cites to the following: *United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007) (Medicare loss calculation underlying sentencing enhancement based solely on unsworn statement of government's attorney); *United States v. Rome*, 207 F.3d 251, 254 (5th Cir. 2004) (PSR statement that defendant and accomplice would have stolen all the guns if they had not been interrupted was amended to PSR only at request of government and without other support in record); *United States v. Narviz-Guerra*, 148 F.3d 530, 537 (5th Cir. 1998) (PSR held defendant responsible for quantity of drugs based solely on information provided by government that was neither attached to PSR nor its corroboration explained); *United States v. Williams*, 22 F.3d 580, 581, n.3 (5th Cir. 1994); *United States v. Elwood*, 999 F.2d 814, 817–18 (5th Cir. 1993) (PSR statement that defendant was "the muscle" behind conspiracy had no factual support in record).

In contrast, the PSR statement that Cox distributed sexually explicit images of Jane Doe 1 is not a bald, conclusory statement that was plucked out of thin air. As explained above, there exist "sufficient indicia of reliability" for that statement in the record before the sentencing judge such that the judge was free to adopt that fact without more unless he was presented with rebuttal evidence or other reason to believe that statement was unreliable. But more critical to the inquiry here, it was not unreasonable, based on the totality of the record, for Brigman to not object to the enhancement or otherwise seek evidence to rebut a PSR statement that reasonably appeared to be supported by the record, including his client's own admissions.

Here, the undersigned FINDS that Cox has failed to overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Lagos*, 25 F.4th at 334 (citing *Strickland*, 466 U.S. at 689)).

### 4.    Prejudice

As explained above, having determined that Cox has failed to demonstrate that Brigman's performance was objectively unreasonable, it is unnecessary to address whether Cox was prejudiced by that performance. *Strickland*, 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."). But if the Court disagrees with the undersigned's findings on the first part of the *Strickland* test, the undersigned further finds that Cox has failed to demonstrate "that there is a reasonable probability that, but for Brigman's failure to object to the distribution

enhancement along the lines now urged by Cox, the result of the proceeding would have been different" or that the confidence in the outcome has been undermined. *Id.* at 694. Specifically, Cox would need to show that, but for Brigman's failure to object to the sentencing enhancement, "he would have received a lesser sentence." *McCalister v. United States*, No. 4:20-CR-0059-P, 2023 WL 2191222, at *3 (N.D. Tex. Feb. 23, 2023) (citing *United States v. Grammas*, 376 F.3d 433 (5th Cir. 2004).

Cox argues from *Molina-Martinez v. United States* that "[a] changed Guideline range will ordinarily suffice to show a reasonable probability of a different result." Cv. Dkt. No. 24 at 9. In *Molina-Martinez*, the Supreme Court held that even on plain error review, "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." 578 U.S. 189, 198 (2016). "[I]n most cases the Guidelines range will affect the sentence," and "a defendant sentenced under an incorrect Guidelines range should be able to rely on that fact to show a reasonable probability that the district court would have imposed a different sentence under the correct range." 578 U.S. at 204.

The Government maintains that "even if [Cox's] counsel had successfully objected to the PSR's two-point distribution enhancement, his new offense level would have been 38, yielding an advisory guideline range of 262 to 327 months' imprisonment." Cv. Dkt. No. 31 at 7. Because Cox ultimately received a 324-month sentence, which is within the

sentence guideline range of the offense level 38, the Government argues that Cox was not prejudiced by Brigman's failures to object. *Id.* The Government also claims that the District Court made clear "that it based its sentence on the Section 3553(a) factors and not the advisory sentencing guidelines." *Id.* at 7–8.

Cox replies that the Government's argument was "unanimously and emphatically overruled" in *Molina-Martinez*. Cv. Dkt. No. 32 at 17. Additionally, Cox notes that the District Court's decision to sentence Cox to the lowest range on the Guideline's range, "rebuts any suggestion that the Guidelines had nothing to do with the sentence imposed." Cv. Dkt. No. 32 at 19.

*Molina-Martinez* turned on the interpretation and application of Rule 52(b)'s plain error standard. 578 U.S. at 194. The Fifth Circuit in that case held that Molina-Martinez failed to establish that the district court's application of an incorrect Guidelines range affected his substantial rights because the incorrect sentencing range and the correct sentencing range overlapped, and Molina-Martinez's actual sentence fell within the overlap. *Id.* at 196–97. The Fifth Circuit had reasoned that, "when a correct sentencing range overlaps with an incorrect range, the reviewing court 'do[es] not assume, in the absence of additional evidence, that the sentence [imposed] affects a defendant's substantial rights.'" *Id.* at 197.

When *Molina-Martinez* reached the Supreme Court, it noted that "the Fifth Circuit stands generally apart from other Courts of Appeals with respect to its consideration of unpreserved Guidelines errors." *Id.* at 198. Concluding that the Fifth Circuit's approach

was "incorrect," the Supreme Court clarified that an error in calculating the Guidelines range shows a reasonable probability that a different sentence would have been imposed without any further showing of prejudice by the defendant. 578 U.S. at 204. However, the Supreme Court also cautioned that "[t]here may be instances when despite application of an erroneous Guidelines range, a reasonable probability of prejudice does not exist." *Id*. at 200.

> The sentencing process is particular to each defendant, of course, and a reviewing court must consider the facts and circumstances of the case before it. The record in a case may show, for example, that the district court thought the sentence it chose was appropriate irrespective of the Guidelines range. Judges may find that some cases merit a detailed explanation of the reasons the selected sentence is appropriate. And that explanation could make it clear that the judge based the sentence he or she selected on factors independent of the Guidelines.

*Id*. at 200.

Since the Supreme Court's decision in *Molina-Martinez*, defendants who have challenged the correctness of their Guidelines range under the plain error standard have fallen along a spectrum. At one end are cases where "the record is silent as to what the district court might have done had it considered the correct Guidelines range," and for these cases "the court's reliance on an incorrect range in most instances will suffice to show an effect on" substantial rights. *Id*. at 201; *United States v. Wikkerink*, 841 F.3d 327, 338 (5th Cir. 2016) ("at the very least, the district court's explanation did not make clear that the district court based the sentence it selected on factors independent of the Guidelines."); *United States v. Islas-Saucedo*, 903 F.3d 512, 520 (5th Cir. 2018) ("The district court did

not provide any explanation as to what it would have done had it considered the correct Guidelines range.").

On the other end of the spectrum are cases where the district court made clear that it would have sentenced the defendant to the same sentence under the correct Guidelines range. For example, the Fifth Circuit found that a sentence at the bottom of Guidelines range was not the determinative factor in a harmless error analysis where the Court stated that the judge at sentencing "stated plainly that . . . [he] would have imposed the same sentence regardless of whether the court" applied an incorrect Guideline range. *United States v. Castro-Alfonso*, 841 F.3d 292, 298 (5th Cir. 2016). Similarly, in *United States v. Reyna-Aragon*, the Court noted that "the district court expressly stated that it would have imposed the 60-month sentence regardless of whether its use of the 2018 Guidelines constituted ex post facto error, given Reyna-Aragon's criminal history." 992 F.3d 381, 389 (5th Cir.), *cert. denied*, 142 S. Ct. 369 (2021). The Court then held that the incorrect Guidelines application was harmless error. *Id.*

Here, Cox's case does not neatly fit at either end of the spectrum. For instance, because Brigman did not object to the sentencing enhancement along the lines now urged by Cox, there was no alternative Guidelines range for the District Court to specifically consider. Additionally, the District Court did not specifically state that it would have imposed the same sentence regardless of the Guidelines. *See* Cr. Dkt. No. 61.

As the Supreme Court noted in *Molina-Martinez*, "sentencing judges often say little about the degree to which the Guidelines influenced their determination," particularly for within-Guidelines sentences. 578 U.S. at 201.

> As a result, the cases where the Guidelines are most likely to have influenced the district court's sentencing decision—those where the court chose a sentence within what it believed to be the applicable Guidelines range—are also the cases least likely to provide the defendant with evidence of the Guidelines' influence beyond the sentence itself. The defendants in these cases should not be prevented by a categorical rule from establishing on appeal that there is a reasonable probability the Guidelines range applied by the sentencing court had an effect on their within-Guidelines sentence.

*Id*. Thus, the rationale behind the Supreme Court's rejection of the Fifth Circuit's "additional evidence" rule appears to be to protect those defendants, sentenced by district judges using incorrect Guidelines ranges who are silent on the factors influencing their decision, from being "barred from relief on appeal simply because there is no other evidence that the sentencing outcome would have been different had the correct range been used." *Id*. at 200. This rationale at least partially explains why the Supreme Court carved out an exception to the *Molina-Martinez* rule where the record is not silent, but rather provides a detailed explanation of the district judge's reasoning. The more detail a district court provides for its sentencing rationale, the more a defendant has to mine for evidence of the prejudicial influence of an erroneous Guidelines range or other prejudicial effect on the defendant's substantial rights.

Which brings us to Cox's sentencing. Here, the District Court was far from silent on the factors it found important to sentencing. Rather, the statements made by the District

Court in imposing Cox's sentence show that his sentence was based on the disturbing and repetitive nature of Cox's crimes. The District Court stated:

> This is an incredibly concerning offense. It's an incredibly disturbing offense. You're here before the Court for coercing and inducing the production of several sexual sexually explicit images and videos from a 16-year-old minor. In total, you possessed 658 images and 74 videos of the minor. You manipulated her, you threatened her, you even distributed one of her images to another individual that she knew.
>
> You also engaged in an [in]appropriate sexual relationship with another minor victim, and you likewise, induced her to produce sexually explicit images. You are considered by me to be a repeat and a dangerous sex offender against minors. It's incredibly serious conduct. Your conduct has undoubtedly caused immeasurable damage to your victims and their families.
>
> Of particular concern is what Mr. Haag pointed out, which is that you were contacted by the police, you were told to cut it out, you had an opportunity to go "What was I thinking? What in the world was I doing?" And you doubled down.
>
> The scope of your conduct is very concerning to me, the consistency and just dogged determination of your conduct and your manipulation and your threats of these victims is very concerning to me, and the fact that there are multiple victims here is concerning. And finally, that you are an actual contact offender. I can't ignore all of that.
>
> I also look, as another guidepost, at your history and characteristics. You are young . . . You do have some criminal history, which includes some violence - - juvenile adjudication for criminal mischief, and prior adult conviction for assault causing bodily injury of a family member. The history of violence against women is particularly concerning to me in light of this offense, and I do find the PSR makes that clear and establishes that.
>
> I have considered the remaining factors as well, which are the need to reflect the seriousness of the offense - - and it doesn't get much more serious than this - - to promote respect for the law, provide a just punishment, afford adequate deterrence, and protect the public from further crimes.

Cr. Dkt. No. 61 at 11–13.

The District Court then considered Brigman's motion for a downward variance based on Cox's young age and lack of maturity, before concluding:

> Mr. Brigman, I understand your argument that "For goodness' sake, do we really need this much time to cause somebody to make a change?" You know, if causing someone to make a change were the only consideration that Congress told me to look to, I would agree with you. I sure hope not. I would hope that we don't need that much time.
>
> But that's not the only consideration that I am required to consider. I consider all of these factors and all those are completely independent of whether he can make a change or not. That's not all this is about. It's about much more than that and I can't ignore that.
>
> So after consideration of all of those factors, the purposes of sentencing, and the parties' arguments, I have considered your request for a downward variance. I can understand it in this case given the age of your client and the length of the advisory range. I do recognize that it's purely advisory and I could downwardly vary if I thought that were appropriate. Given all of the 3553(a) factors that I have discussed today, I don't think it would be. I have determined that a sentence of 324 months is sufficient but not greater than necessary.

*Id.* at 13–14. The District Court then imposed a 324-month sentence. *Id.*

Nothing in the District Court's statements at sentencing suggest the Court believed the facts of the case merited a low-end-of-the-Guidelines sentence.[11] The District Court's only reference to the Guidelines occurred at the beginning of sentencing when advising Cox of his Guidelines range and again, and then only indirectly, in denying Cox a downward variance. *Id.* at 7, 14. Thus, the sole direct reference to the Guidelines range

---

[11] It is perhaps telling that despite the District Court's detailed explanation for Cox's sentence, Cox's only meaningful argument that the Guidelines impacted his sentence is the fact that he received the lowest end of the Guideline applied.

appears to be little more than a means of introducing Brigman's argument for a downward variance:

> (The Court): We have an Offense Level of 40, a Criminal History Category of II, and that results in an advisory guideline range of 324 to 360 months' imprisonment.
>
> Mr. Brigman, I would be glad to hear any argument you have on behalf of your client, including any argument you planned to make previously about why you think a downward variance is appropriate here.

*Id*. at 7–8.

The undersigned cannot find that the record here is silent as to what sentence would have been imposed had a lesser Guideline range been applied. The District Court's sentence of 324 months appears to have been determined based on the severity of Cox's conduct, including his persistence in victimizing Jane Doe 1 despite being warned by police to cease contact, the volume and nature of images he coerced from Jane Doe 1, his manipulation of her through threats (including the distribution at issue here), his being a repeat and dangerous offenders, the damage he caused to the victims and their families, and the fact that he was an actual contact offender. *Id.* at 11–14. These statements reflect a consideration by the District Court of § 3553(a) factors other than, and independent of, the Guideline range. Again, there is nothing to suggest that the District Court's consideration of these factors was somehow intended to justify increasing what might have otherwise been a lower sentence under a different Guideline range upward to reach the 324-month bottom of his current Guidelines range. Indeed, there is ample evidence in the Court's sentencing statements to the contrary.

Cox argues that when a district court sentences a defendant to the exact end of the sentencing guideline, this is evidence that the Guidelines were used in making its determination. Cv. Dkt. No. 32 at 18–20. He states that "[t]he government wishes to chalk up the number 324 to a singularly improbable coincidence." *Id.* at 19. Cox goes on to say that the "Fifth Circuit has declined to do so even when the district court actually says that the same sentence would have been imposed under different Guidelines," citing to a Fifth Circuit case on direct appeal which analyzed whether the District Court considered the incorrect Guideline range during sentencing.[12] *Martinez-Romero*, 817 F.3d at 924–26.

There, despite the sentencing judge stating multiple times that she would have imposed the same sentence on the defendant despite the Guidelines, the Fifth Circuit found that the Guidelines impacted her decision, in part, because of her imposition of a sentence at the very end of the Guideline range. *Id.* However, the Fifth Circuit also noted that the sentencing judge "expressly state[s] that . . . [Defendant's] prior conduct was 'sufficient to justify a sentence within this range of 46-57 months.'" *Id.* at 926. And the Court found that

---

[12] Most of the cases cited by Cox are analyzed under a harmless error standard with the burden of proof on the Government to show that despite an error in Guideline range, "evidence in the record . . . convincingly demonstrates the district court would impose the *same* sentence for the *same* reasons." *United States v. Ibarra–Luna*, 628 F.3d 712, 714 (5th Cir. 2010). The prejudice prong of *Strickland* requires a showing of a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different—this is analogous to the showing a defendant must make when their appeal is being reviewed for plain error. *See United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004). Applied to the facts here, this means Cox must show that had Brigman successfully objected to the enhancement, the different Guideline range would have changed his sentence. Thus, cases deciding whether, but for an incorrect Guideline range being applied, a different sentence would have been imposed, are relevant to the analysis in this context. *See McCalister v. United States*, No. 4:20-CR-0059-P, 2023 WL 2191222, at *3 (N.D. Tex. Feb. 23, 2023) (applying *Molina-Martienz* and a Fifth Circuit case on direct appeal to the prejudice prong of a 2255 Motion for ineffective assistance of counsel); *see also Willner v. United States,* No. 11-20100-CR, 2018 WL 9815445, at *24 (S.D. Fla. Dec. 18, 2018), *report and rec. adopted*, 2019 WL 5104509 (S.D. Fla. Mar. 29, 2019) (applying *Molina-Martinez* to the prejudice prong of an ineffective assistance of counsel case).

this "remark constitutes evidence that the improper guideline range influenced the court's selection of the sentence" because it was an "attempt to justify the precise range that . . . [the Fifth Circuit] concluded was improperly calculated." *Id.*

Here, the District Court did not attempt to justify a sentence within the Guideline range. And when presented an opportunity to consider a lower sentence through a downward variance, the District Court acknowledged that while it could downward vary if it thought it were appropriate, it returned to the § 3553(a) factors it had discussed and concluded that those factors made imposition of a lower sentence inappropriate.[13] Cr. Dkt. No. 61 at 13–14.

The undersigned acknowledges that a finding of no prejudice here is complicated by the fact that Cox was sentenced at the precise bottom of what he argues was an erroneously high Guideline range. As Cox points out, numerous Fifth Circuit cases stand for the proposition that a sentence imposed on the low end of an incorrect guideline range is evidence that the guideline range had an impact on the District Court's sentencing determination.  Dkt. No. 32 at 20, 21 n.2; *Martinez-Romero*, 817 F.3d at 925 (when a

---

[13] The undersigned makes note of *United States v. Sanchez-Arvizu*. 893 F.3d 312 (5th Cir. 2018). In that case, the district court incorrectly applied a 16-level enhancement to Defendant's sentence. At sentencing, the probation officer and defense counsel discussed the application of alternative Guideline ranges, with one range being the correct one. *Id.* at 316. But despite the correct Guideline range being mentioned, the Fifth Circuit found that the record was silent "with regard to how the court would have sentenced [the defendant] had it considered the correct Guidelines range." *Id.* at 317. The Court reasoned that the lower court "centered" its discussion at sentencing on the probation officer's incorrect Guideline range. *Id.* And that defense counsel and the probation officer's suggested ranges were treated "as an optional downward departure and not as 'the framework for sentencing' to 'anchor [its] discretion.'" *Id.* The undersigned here does not suggest that the District Court considered the correct Guideline range when discussing a downward variance. It uses the Court's discussion of a downward variance to emphasize that the Court's sentence in this case was based on considerations separate from the Guidelines, and it would have imposed this sentence regardless of whether a different range had been applied.

sentence "coincides with the lowest end of the improperly calculated guideline range," like Cox's 324-month sentence does, this is evidence that "the error influenced the district court's determination" of the defendant's sentence.).

Although no authority expressly states that a sentence on the precise end of the Guideline range means the Guideline range was considered, this factor merits consideration where the District Court, as here, did not explicitly say that it would have imposed the same sentence despite the Guidelines. Quoting *Molina-Martinez*, Cox urges that his 324-month sentence "'is conspicuous for its position as the lowest sentence within what the District Court believe to be the applicable range.'" Dkt. No. 32 at 19. (quoting *Molina-Martinez*, 578 U.S. at 202). And that "[t]he number 324 is particularly unlikely number to come to mind in the absence of the Guidelines." *Id*. And "[i]f the court were truly uninfluenced by the Guidelines, it could have said as much." *Id*. at 20.

But Cox is attempting to turn the common-sense rationale of *Molina-Martinez* into a rigid rule where a District Court's explanation for a sentence, no matter how detailed, can be thrown out simply because the District Court did not utter the magic words. Cox's argument also suggests that a sentence at the very bottom of the "incorrect" Guideline range will show that a defendant would have received a lower sentence had a different range been imposed regardless of how extensively a judge at sentencing stresses factors independent from the Guidelines.

The undersigned does not believe *Molina-Martinez* should be read to provide a categorical rule that a sentence arrived at through a consideration of non-Guidelines §

3553(a) factors can never align with the low end of the applicable guideline lest it be deemed prejudicial to a defendant's substantial rights. Such a rule would be particularly inappropriate where, as here, the District Court provided a detailed explanation of its sentencing rationale based on non-Guidelines § 3553(a) factors. As the Supreme Court cautioned in *Molina-Martinez*, "[t]here may be instances when despite application of an erroneous Guidelines range, a reasonable probability of prejudice does not exist" because:

> [t]he sentencing process is particular to each defendant . . . and a reviewing court must consider the facts and circumstances of the case before it . . . The record in a case may show, for example, that the district court thought the sentence it chose was appropriate irrespective of the Guidelines range. Judges may find that some cases merit a detailed explanation of the reasons the selected sentence is appropriate. And that explanation could make it clear that the judge based the sentence he or she selected on factors independent of the Guidelines.

578 U.S. at 200.

Here, the District Court's non-Guidelines-based rationale for why Cox's sentence was appropriate should not be thrown out simply because it also aligned with the low end of that range. *Molina-Martinez* instructs the Court that prejudice does not exist when it is clear the district court based its decision on factors independent from the Guidelines. *Molina-Martinez*, 578 U.S. at 200. This is the case here.

For these reasons, the undersigned finds that even if Brigman's performance fell below an objective standard of reasonableness, Cox has not shown that he was prejudiced by that failure.

**B.     Failure to follow instructions to file an appeal or consult regarding the filing of appeal.**

Cox's original § 2255 Motion to Vacate stated a single Ground One for his Motion: "Counsel failed to consult Cox regarding filing an appeal after sentencing and completely ignored Cox's instruction to file an appeal." Cv. Dkt. No. 1 at 4. Through his Amended Motion, filed after the Court permitted Cox to amend his Motion to include the additional ground related to the distributed images discussed above, Cox simply states: "Ground one from the original Motion filed October 25, 2021 is incorporated by reference." Cv. Dkt. No. 23 at 7. But neither party briefs nor otherwise addresses Ground One, although they developed testimony during the hearing on this issue. But because Cox does not appear to have formally abandoned Ground One, the undersigned next applies the *Strickland* standard to Cox's argument that Brigman was deficient in failing to file a notice of appeal. As a part of this inquiry, the undersigned also considers whether Brigman rendered ineffective assistance of counsel by failing to fulfill his consultation obligations regarding the appeal.

In *Roe v. Flores-Ortega*, the Supreme Court applied *Strickland* to claims "that counsel was constitutionally ineffective for failing to file a notice of appeal." 528 U.S. 470, 477 (2000). In such cases, the *Strickland* analysis "begins with the question whether counsel 'consulted' with the defendant regarding an appeal." *United States v. Cong Van Pham*, 722 F.3d 320, 323 (5th Cir. 2013) (quoting *Flores-Ortega*, 528 U.S. at 478). A consultation occurs where counsel "advis[es] the defendant about the advantages and

disadvantages of taking an appeal, and ma[kes] a reasonable effort to discover the defendant's wishes." *Flores-Ortega*, 528 U.S. at 478.

If a consultation has occurred, "[c]ounsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." *Id*. In cases where "an attorney perform[s] deficiently in failing to file a notice of appeal despite the defendant's express instructions, prejudice is presumed 'with no further showing from the defendant of the merits of his underlying claims.'" *Garza v. Idaho*, 139 S. Ct. 738, 750 (2019) (citing *Flores-Ortega*, 528 U.S. at 484). Prejudice is presumed because counsel's deficient performance "deprives a defendant of an appeal that he otherwise would have taken." *Flores-Ortega,* 528 U.S. at 484. "[T]he presumption of prejudice recognized in *Flores-Ortega* applies regardless of whether a defendant has signed an appeal waiver." *Garza*, 139 S. Ct. at 749. "[I]f the petitioner is able to demonstrate by a preponderance of the evidence that he requested an appeal, prejudice will be presumed and the petitioner will be entitled to file an out-of-time appeal . . . ." *United States v. Tapp*, 491 F.3d 263, 266 (5th Cir. 2007).

If consultation has not occurred, the court must ask whether counsel had an obligation to consult with the defendant on the issue of filing an appeal. *Flores-Ortega*, 528 U.S. at 478. A lawyer who fails to consult where he has a duty to do so renders deficient performance. *See id*. Generally,

> counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous

grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known. Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.

*Flores-Ortega*, 528 U.S. at 480 (internal citations omitted).

A defendant can reasonably demonstrate an interest in appealing by an "ample demonstration of [the defendant's] interest in doing something to change the outcome of his sentencing through additional proceedings." *United States v. Pham*, 722 F.3d 320, 325 (5th Cir. 2013). However, merely expressing dissatisfaction regarding the outcome is not sufficient. *See United States v. Casarez*, 304 F. App'x 325, 325 (5th Cir. 2008) (per curiam) (finding that "[a]lthough [the defendant] was upset about sentencing matters before and after the sentencing hearing, [the defendant] did not express to counsel any interest in appealing the sentence either when [the defendant] spoke to counsel after the sentencing hearing or when [the defendant] called counsel's office.") (cited in *Pham*).

In framing the analysis set forth in *Flores-Ortega*, the Supreme Court noted its prior guidance in *Strickland* that, given the "variety of circumstances faced by defense counsel," courts must assess the reasonableness of their conduct within the context of the particular

facts they face and as of the time they face them. *Flores-Ortega*, 528 U.S. at 477 (quoting *Strickland*, 466 U.S. at 688–89). In other words, the inquiry is one of "circumstance-specific reasonableness." *Id.* at 478. Moreover, as explained elsewhere, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 477 (quoting *Strickland*, 466 U.S. at 689). Nevertheless, "[t]he Supreme Court predicted that district courts would find a duty to consult 'in the vast majority of cases.'" *Pham*, 722 F.3d at 324 (quoting *Flores-Ortega*, 528 U.S. at 481).

Finally, "prejudice is presumed 'when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken,'" even if the defendant has signed an appellate waiver. *Garza v. Idaho*, 139 S.Ct. 738, 744 (2019) (quoting *Flores-Ortega*, 528 U.S. at 484. To establish prejudice in this context, need only show "that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Flores-Ortega*, 528 U.S. at 484.

### *1.* *Brigman did not consult with Cox about an appeal*

The testimony of Cox and Brigman at the hearing is consistent regarding the information Brigman provided to Cox about appealing. Brigman only discussed with Cox the waiver of appeal included in Cox's plea agreement prior to his sentencing. Neither Brigman nor Cox testified that they discussed the advantages and disadvantages of Cox appealing, either before or after sentencing. Cv. Dkt. No. 49 at 25, 26, 31–33. And because

there is no dispute on this point, the undersigned FINDS that consultation did not occur. *See* Cv. Dkt. No. 49; *Flores-Ortega*, 528 U.S. at 478.

2.    <u>*Brigman had a duty to consult with Cox about an appeal*</u>

Having established that consultation did not occur, the Court must consider whether consultation in this case was nonetheless required. As explained above, Brigman was required to consult with Cox regarding the advantages and disadvantages of appealing if there was reason to think either (1) that Cox reasonably demonstrated to Brigman that he was interested in appealing, or (2) that a rational defendant in Cox's circumstances would want to appeal, *e.g.*, there is a nonfrivolous basis for an appeal. *Flores-Ortega*, 528 U.S. at 478.

**a.  Did Cox reasonably demonstrate his interest in appealing?**

Brigman and Cox have conflicting testimony regarding whether Cox told Brigman he wanted to appeal. Cox claims that before being removed from the courtroom after sentencing, he told Brigman "I want an appeal." Cv. Dkt. No. 49 at 34. Cox testified that he attempted to call Brigman after being returned to the detention center but was unsuccessful in reaching him. Cox then called his mother and asked if she "could please try to get ahold of Brigman so we could figure out how to make an appeal." *Id*. at 36.

On direct examination by his attorney, Cox testified that he specifically told Brigman he wanted to appeal and tried to contact him following sentencing:

> A. After I was sentenced, Brigman turns around and tells me, we did good, we got the low end. And I told him, I want an appeal. And then I was dragged--well--dragged, but—

63

Q. Did you-- Excuse me.
A. --I was walked out of the courtroom, and I asked to speak with Brigman with one of the court marshals . . . .
. . .
Q. All right. Have you ever talked to Fred Brigman after that?
A. No.
Q. Okay. Did you make any effort to call Mr. Brigman after that?
A. Yes, I did.
Q. Tell me about that.
A. As soon as I got back to the jail, I asked the lady in R&D if I could call my attorney, because I didn't get to speak with him at court. And she says, well, go ahead. And I told her I did not have his number on me, because I moved from Eden Detention Center to Haskell, and they wouldn't allow me to take my paperwork, so I no longer had his number. So she very nicely looked up his number, his office number, and I proceeded to call him on the phone in R&D.
Q. Did you succeed in speaking to him?
A. No, I did not.
Q. All right. Did you succeed in talking to anybody on the phone either that day or the next?
A. Yes. My mother.
Q. What did you say to her?
A. I told her, I can't get ahold of Brigman; I've tried and tried, and it's not--I don't know if it's going through, because it's not ringing; is there any way you could please try to get ahold of Brigman so we could figure out how to make an appeal.

*Id.* at 34–36.

And on cross examination by the Government's attorney, Cox testified further about his and his mother's efforts to contact Brigman post-sentencing:

Q. So after you were sentenced, Mr. Brigman didn't tell you to call him if you had any questions?
A. No, he did not.
Q. You did try to call him. Right?
A. Yes, I did.
Q. To ask him to appeal?
A. Yes.
Q. What about your case did you want to appeal?

A. For ineffective assistance of counsel.

Q. That was it?

A. That was it, because I had evidence that was not presented at all to the DA.

Q. And when you called Mr. Brigman's office, did you talk to anyone?

A. No, I did not.

Q. You didn't talk to a single person that worked in his office?

A. No.

Q. When you had called in the past, had you talked to anyone?

A. No, I did not. When--the one time that I spoke to Brigman on the phone-- Well, excuse me. I spoke to Brigman twice on the phone, but one was for my PSI, and the other one, the counselor at Eden Detention Center got ahold of Brigman himself for me, and so he was already on the phone.

Q. Okay. So you had--you, yourself, had never placed a call to Brigman before?

A. No.

Q. Okay. And so when you called this time, no one picked up the phone?

A. Correct.

Q. Okay. You don't have any records of you making those phone calls, do you?

A. Not that I know of.

Q. Just your word?

A. Yes.

Q. You had Mr. Brigman's email address, didn't you?

A. Not when I was in Haskell County, no.

Q. Okay. Your mom could have gotten that email address for you, couldn't she?

A. I presume, yes.

Q. You didn't ask your mom to email Mr. Brigman, did you?

A. No. I wasn't thinking about emailing. I was thinking about getting straight to him and not waiting.

Q. Because it was important for you to appeal. Right?

A. Yes.

Q. It was so important that you asked your mom to call him. Right?

A. Yes.

Q. You didn't ask your mom to go over to his office?

. . .

A. Yes, I did.

. . .

Q. Mr. Cox, I believe you just testified that it was very important for you to get ahold of Mr. Brigman.

A. Yes, I did.

Q. That you wanted to get in touch with him directly?

A. Yes.

Q. And that's why you didn't ask your mom to email him?

A. Yes.

Q. And that's why you were trying to call him?

A. Yes.

Q. And that's why you were asking your mom to call him?

A. Yes.

Q. You didn't ask your mom to walk over to his office, did you?

A. Yes, I did.

Q. You did?

A. It was during the pandemic, and she told me his office was closed.

Q. Well, that's nowhere in your Section 2255 motion, is it?

A. No, it's not.

Q. Is this something that you're just remembering now?

A. No.

Q. It's something you left out of the motion?

A. Yes.

Q. Just like you left out telling the Court that you hadn't actually read your plea agreement?

A. Yes.

Q. So you also had Mr. Brigman's address, because you wrote a letter to him before. Right?

A. Yes, I did.

Q. But you didn't think about writing him a letter about appealing?

A. No, because like I said previously, I thought I couldn't write anybody indirectly after receiving the letter from Judge Hendrix.

Q. You didn't think you could write your own lawyer?

A. No, I did not.

Q. Why was that?

A. I don't know. I--I didn't know any--I've never been incarcerated before, and I didn't know--I didn't know the process or the proceedings or anything. I didn't know that I was--it's my legal right to be able to contact my attorney through a letter. I thought--from my understanding, was that I had to go through a counselor at the facility that I was at to be able to get ahold of my attorney.

Q. Mr. Brigman didn't tell you that, did he?

A. No, he did not.

Q. No. That's just something you came up with yourself?

A. Yes, that's--yes.

> Q. Are you aware that your mother actually talked to Mr. Brigman after you were sentenced?
> . . .
> A. As far as I was concerned, she did not have a conversation with Mr. Brigman either.
> Q. Ever, after your sentencing?
> A. Ever.

*Id.* at 42–48.

Brigman's testimony is unsurprisingly different. When Brigman was examined by the Government's attorney on whether he spoke to Cox after his sentencing, he testified about his post-sentencing conversations with Cox and his mother, and his office practices regarding client communications and the filing of notices of appeal:

> Q. Okay. And again, before sentencing, did you discuss Mr. Cox's right to appeal with him?
> A. Yes.
> Q. What did you tell him?
> A. I said, you have a right to appeal. You've waived your right to appeal, but you have a right to appeal. You've got a right to file a notice of appeal and have some other lawyer look at my work and see if I'm ineffective. And if there's anything else messed up in your case, they can go after that, too. Any other points of error, they can go after that. And--anyway, I explained it to him.
> Q. And so, ultimately, Mr. Cox didn't get a downward variance, did he?
> A. No.
> Q. He got low end of the guidelines?
> A. Yes.
> Q. Was that a sentence you were expecting?
> A. Well, I was really hoping for the--for a downward variance, but yeah, I was--I was--I certainly wasn't--I would have been shocked had Judge Hendrix given him the top of the guidelines.
> Q. So is it a reasonable sentence in your mind?
> A. Yes.
> Q. Now, after sentencing, did you talk to Mr. Cox?
> A. Briefly, like at the podium. He was being led away by the marshals and I was talking to him.

Q. And you told him, call me if you need anything? I'm going to try to come and see you down below, but if I don't see you, call me if you need anything?

A. Yes.

Q. Cox didn't say anything after he was sentenced, did he?

A. No.

Q. He didn't say, hey, Fred I want to appeal?

A. No.

Q. Because you would have appealed if he had said that?

A. Oh, I'd have probably done it--if I hadn't done it that day, I would have done it the next day.

Q. Did Mr. Cox ever call you again?

A. No.

Q. And he had called you in the past. Right?

A. Yes.

Q. Multiple times?

A. Yes.

Q. But after sentencing, never called you again?

A. No.

Q. Did you talk to Mr. Cox's family after he was sentenced?

A. At the back of--when I was leaving the courtroom, I talked to the family.

Q. Who did you talk to?

A. I talked to his mother, I believe.

Q. And what did you guys talk about?

A. She asked me where he--where they were going to take him.

Q. Okay. Did she ask about an appeal?

A. No.

Q. Did you talk about any sort of--did you ask his--did you tell his mom, hey, if Josh wants to appeal, tell him to call me?

A. Well, what I told him his mom was, if--when you talk to Josh, have him call me.

Q. Okay.

A. Because I didn't know where--I didn't know where he was going to be, because during the pendency of the case before sentencing, he was in Eden. Sentencing was in Lubbock. And, you know, they had moved him up there a couple of days before, and I didn't know if they were going to take him back to Eden or where they were going to put him. So I said, if you talk to him, have him call me so I can talk to him.

. . .

Q. Now, you have some people that work for you in your office. Right?

A. That's correct.

Q. They answer the phone when people call?

68

A. Yes.

Q. They take messages?

A. Yes.

Q. They tell you if you miss a call?

A. Yes.

Q. If you missed a call from either Mr. Cox or his mom, your staff would have told you, wouldn't they?

A. Yes.

Q. And, in fact, that happened after Cox was sentenced. Right?

A. I believe so, yeah.

Q. Do you remember what the context of that was; who called you and what they asked?

A. It was--it was his mother.

Q. What did she ask?

A. Where he was going.

Q. She didn't say, hey, Fred, I've been trying to contact you?

A. No.

Q. She didn't say, hey, Fred, we've been trying to file a notice of appeal?

A. No.

Q. Hey, Fred, we want to file an out-of-time notice of appeal?

A. No.

Q. She just wanted to know where he was housed?

A. Yes.

Q. Now, you--

A. That's correct.

Q. Now, you have a website for your law practice. Right?

A. That's correct.

Q. And that website lists your phone number?

A. Yes.

Q. And your address?

A. Yes.

Q. And has a link for people to use to email you?

A. Yes.

Q. If you had received an email from either Cox or his mom about filing an appeal, would you have appealed?

A. Oh, absolutely.

Q. And even if the time to appeal had expired?

A. Yes.

Q. Because it's an easy process. Right?

A. Exactly.

Q. It's no skin off your nose. You're going to withdraw?

A. Right.
Q. In fact, you have filed notices of appeals in the past for clients that you
didn't think should have appealed. Right?
A. Yes.
Q. So it didn't matter to you that Josh Cox waived his right to appeal?
A. No, not at all.
Q. You would have--you would have filed that notice anyway?
A. Yes.

*Id*. at 84–89.

Neither Cox's mother nor any member of Brigman's staff was called to testify at

the § 2255 hearing.

Brigman further testified that he has been practicing federal criminal defense for

over twenty years and has filed numerous notices of appeal in those years. *Id.* at 75–76.

Brigman testified about the process he uses in filing notices of appeal and stated that "it's

a real – – it's a simple process." *Id*. at 75. Brigman testified that if a client tells him he

wants to appeal, Brigman files a notice of appeal followed by a motion to withdraw to

enable the Court to appoint appellate counsel. *Id*. at 76. The process does not take long and

Brigman's staff typically prepares the notice and motion. *Id*. When asked to explain at what

point in the process he files the notice of appeal, Brigman testified that, "Typically– –I

mean, if they tell me they want to appeal at sentencing, I'll typically do it within a day or

two." *Id*.

Although a defendant does not need to use the specific word "appeal" to show he

wants to appeal, he must give "'some specific indication' to counsel that he wanted to

appeal.'" *Kilborn v. United States*, No. 4:19-CV-515, 2021 WL 5238842, at *3 (E.D. Tex.

Nov. 8, 2021) (quoting *Escalante v. United States*, No. B:14-481-1, 2016 WL 5947375, at *10 (S.D. Tex. Sept. 9, 2016)). For example, in *Kilborn*, the court held that the movant did not reasonably demonstrate their desire to appeal because there was no evidence that the movant mailed a letter to his counsel discussing that his mom would speak to counsel about an appeal, and there was no evidence of the voicemail that movant's mother testified to leaving counsel. *Kilborn*, 2021 WL 5238842 at *3.

Cox cites to *Cuddington v. United States*, claiming that the facts of *Cuddington* are analogous to his. No. 6:21-cv-65, 2019 WL 1369046, (N.D. Tex. Feb. 14, 2019) *report and rec. adopted,* 2019 WL 1359125 (N.D. Tex. Mar. 26, 2019); Cv. Dkt. No. 2 at 3. In that case, after the movant was sentenced, there was conflicting testimony about whether he told his attorney that he wanted to appeal. *Cuddington*, 2019 WL 1369046 at *14. But the movant later entrusted to his fiancée the job of telling his attorney he wanted to appeal after sentencing. *Id.* The court found that the voicemail left by the fiancée to movant's attorney, her email asking the attorney what else they could do after sentencing, and the arrangement of a conference call with her and movant's father was enough to invoke the attorney's duty to consult with movant about an appeal. *Id.* at 17.

Cox believes that the facts of his case are analogous because "his mother tried numerous times, post sentencing . . . to contact counsel and at the very least talk to them about the advantages and disadvantages of filing an appeal." Cv. Dkt. No. 2 at 3. But the Court finds the facts in *Cuddington* distinguishable from the facts of Cox's case. Here, unlike in *Cuddington*, where the Movant's fiancée spoke to his attorneys and produced

proof of an email and voicemail reaching out to movant's attorneys, Brigman does not claim to have spoken to Cox's mother at any point other than directly after sentencing, and this conversation did not relate to an appeal. *Cuddington*, 2019 WL 1369046 at *2, 8; *see also Sayers v. United States*, No. 417CR00046ALMKPJ1, 2021 WL 1680494, at *9 (E.D. Tex. Mar. 31, 2021), *report and rec. adopted*, 2021 WL 1667206 (E.D. Tex. Apr. 28, 2021) (finding that attorney had duty to consult when movant's husband contacted the attorney, and the attorney's paralegal testified that he knew Movant's husband was contacting because Movant wanted to appeal).

While Cox claims he called Brigman after sentencing and that his mom later called multiple times, Brigman testified he never received information about a phone call or a voicemail from his staff. Cv. Dkt. No. 2 at 3; Cv. Dkt. No. 49 at 85, 87. Brigman also did not receive any emails from Cox's mother post-sentencing, nor did Cox write to Brigman. Cv. Dkt. No. 49 at 88, 46–47. Again, neither Cox's mother nor any member of Brigman's staff was called to testify at the § 2255 hearing. And the undersigned does not find credible Cox's testimony regarding his belief that he could not write Brigman, whom he had previously written without issue, simply because he was directed to not write the presiding district judge in his case. *See id.* at 46.

As explained above, courts consider several factors in determining whether a defendant has reasonably communicated an interest in appealing including, relevant here, whether the conviction follows a guilty plea that includes a waiver of most appellate rights and that results in a sentence at the lower end of the Guidelines, and within the 15 to 30

year estimate Brigman provided Cox.[14] *Id.* at 42. Additionally, Cox testified that he initiated the plea agreement by contacting Brigman and "ask[ing] him if I could please sign a plea agreement, because I didn't want to serve 55 years." *Id.* at 31.

Ultimately, Cox's only evidence of his or his mother's efforts to contact Brigman post-sentencing is his testimony set out above. And even if the Court accepts as true that Cox's mother attempted to call Brigman's office regarding an appeal, there is no evidence Brigman had any knowledge of those attempts, or that they related to Cox's desire to appeal.

On this record, the undersigned is unable to conclude that Cox has shown an "ample demonstration of [his] interest in doing something to change the outcome of his sentencing through additional proceedings." *See Pham*, 722 F.3d at 325. Again, merely expressing dissatisfaction regarding the outcome of one's case is not sufficient. *See Casarez*, 304 F. App'x at 325.

After careful consideration of the applicable legal standards and the testimony of both Cox and Brigman, the undersigned FINDS that Brigman's testimony on his post-sentencing communications with Cox and his mother, and his testimony regarding his office's practice of filing notices of appeal, are both more credible than Cox's testimony. For this reason, the undersigned further FINDS Cox failed to reasonably demonstrate to Brigman his interest in appealing.

---

[14] While an appellate waiver may limit a defendant's appellate options, they do "not relieve counsel of the duty to consult about those options once [defendant] ha[s] reasonably demonstrated his interest in an appeal." *United States v. Cong Van Pham*, 722 F.3d 320, 326 (5th Cir. 2013).

### b.  Would a rational defendant in Cox's circumstances want to appeal?

As explained above, Brigman still had a constitutional duty to consult with Cox if Brigman had reason to think that a rational defendant would want to appeal. *Flores-Ortega*, 528 U.S. at 480. And even if it appeared to Brigman that Cox did not want to appeal prior to sentencing, "events occurring at and after sentencing must be taken into consideration when determining whether an attorney has breached the duty to consult." *Cuddington*, 2019 WL 1369046, at *17.

As discussed, Cox was indicted in a four-count Indictment charging him with two counts of Production of Child Pornography in violation of 18 U.S.C. § 2251(a) and two counts of Enticement of a Minor in violation of 18 U.S.C. § 2422(b). Cr. Dkt. No. 1. A post-arrest consensual search of his phone revealed "numerous sexually explicit images and videos of a minor female who Cox identified as 'Jane Doe 1' and whom he believed was younger than 18 years old." Cr. Dkt. No. 30 at 3. Cox was 20 years old at the time of his arrest and the videos and photos found on his phone in 2019 dated back to 2018. *Id.* He was facing a term of imprisonment of not less than fifteen (15) years nor more than thirty (30) years on each of the two production counts. 18 U.S.C. § 2251(e). And he faced a term of imprisonment of not less than ten (10) years and up to life on each of the enticement counts. 18 U.S.C. § 2422(b). In total, Cox was facing a life term of imprisonment. He pleaded guilty to a single production count that exposed him to a term of imprisonment of 15 to 30 years. Cr. Dkt. No. 28. And as part of the plea agreement, the Government agreed

to not bring any additional charges against Cox based on the conduct related to his plea and to dismiss, after sentencing, the remaining three charges. *Id.* at 4–5.

Cox admits that at the time of his plea, he thought he benefited from the plea agreement. Cv. Dkt. No. 49 at 40–43. But he testified that, "later on, I found out, no, I did not." *Id*. at 40. And when asked what he wanted to appeal about his case, Cox testified that he wanted to appeal "[f]or ineffective assistance of counsel[] . . . because I had evidence that was not presented at all to the DA." *Id*. at 42–43. Cox says he should have taken it to trial even if it meant spending the rest of his life in prison because "It would - - it would be worth it." *Id*. at 40–41. Other than this conclusory statement, Cox did not testify as to what evidence was not presented to the Government or its bearing on the plea process or, alternatively, his trial, *i.e.*, how it would have changed the outcome of his case. Cox's testimony never reconciles the tension between his post-conviction statement that going to trial on all four counts "would be worth it" with his admission that he agreed to the plea agreement in part so that the Government would dismiss the other charges and so he would not risk being sentenced to a life term of imprisonment. *Id.* at 40.

As explained above, in determining whether a rational defendant would have wanted to appeal, "courts must take into account all the information counsel knew *or should have known*." *Flores-Ortega*, 528 U.S. at 480. (emphasis added). This "should have known" determination reflects *Strickland*'s objective standard of reasonableness and the need for the Court to consider the totality of circumstances faced by counsel. *Id*. As explained above, courts "must be careful 'to eliminate the distorting effects of hindsight,

to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Shepherd*, 880 F.3d at 741 (quoting *Strickland*, 466 U.S. at 690). Thus, this scrutiny "'must be highly deferential[,]' and 'a court must indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). This means "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy' because '[t]here are countless ways to provide effective assistance in any given case.'" *Strickland*, 466 U.S. at 689 (citing *Michel*, 350 U.S. at 101).

There are two potential appellate issues raised by Cox that the Court must consider from the viewpoint of a rational defendant. The first is the issue Cox claims was on his mind in the immediate aftermath of his sentencing. Cox claims he wanted to appeal "[f]or ineffective assistance of counsel[] . . . because I had evidence that was not presented at all to the DA." Cv. Dkt.  No. 49 at 42–43. "It would - - it would be worth it." *Id.* at 41. As explained above, Cox fails to identify what evidence was not presented to the Government or its bearing on the plea process, or, alternatively, his trial, *i.e.*, how it would have changed the outcome of his case. And Cox fails to explain the inconsistency between his testimony that going to trial on all four counts "would be worth it" with his admission that he wanted to plead guilty to avoid the risk being sentenced to a life term of imprisonment if he went to trial. *Id.* at 40.

Importantly, this is not a situation where Cox was convicted for the distribution of sexually explicit images that he stipulated through the Factual Resume were merely nude, and for which there was no further factual support in the record for their sexual explicitness. Rather, this is a situation where Cox pleaded guilty to the production of child pornography and, as part of that plea, admitted not only to sufficient facts to independently support that he committed each essential element of that crime, but also to further facts that he engaged in a multi-year relationship with the minor victim during which he induced or coerced her to produce hundreds of sexually explicit images, including at least 658 images and 74 videos. Cr. Dkt. No. 30. And Cox further admits through his Factual Resume that at some point during that relationship he sent nude images of his minor victim to her boyfriend. *Id.* at 4. While a rational defendant in the former situation might want to appeal on the basis Cox raises here, his unsupported conclusion that he "had evidence that was not presented at all to the DA" fails to establish a basis for a rational defendant to appeal in the latter situation. *See* Dkt. No. 49 at 43.

Ultimately, Cox fails to support his claim that a rational defendant in his circumstances as they stood immediately after his sentencing would have wanted to appeal on the basis that he had evidence that was not presented to the Government and that his counsel was somehow ineffective in this regard.

But the Court also considers whether a rational defendant in Cox's circumstances would have wanted to appeal based on Brigman's failure to object to the distribution enhancement based on the images either not being sexually explicit or not being relevant

conduct, discussed at length above. As explained above, this question must turn on whether Brigman "had reason to think" that a rational defendant would want to appeal on this basis. *Flores-Ortega*, 528 U.S. at 480. And the only reason Brigman might have had to think a rational Cox would have wanted to appeal on this basis is if Brigman had reason to believe the distributed images were merely nude and not sexually explicit, or that the Government could not prove the latter, as Cox now argues. Cv. Dkt. No. 24 at 5–6.

Based on the Court's above findings, Brigman had no reason to believe, after reviewing the evidence and discussing the Plea Agreement and Factual Resume with Cox, that the distributed images were anything other than sexually explicit. Moreover, Brigman had no reason to believe that a rational Cox would have wanted to put the Government to its proof on whether the distributed images were sexually explicit, particularly considering Cox's admissions in the Factual Resume, the images viewed by Brigman, and the possibility—if not probability—that, if challenged, the Government indeed could and would establish the sexually explicit nature of the images by a preponderance, either through the agent, Jane Doe 1, her sister, or the former boyfriend.

And for this reason, the undersigned further FINDS that Cox has failed to support his claim that a rational defendant in his circumstances as they stood immediately after his sentencing would have wanted to appeal based on Brigman's failure to object to the enhancement because the distributed images were not, or could not be proven to be, sexually explicit or relevant conduct.

### 3.    *Was Cox prejudiced?*

For reasons explained above, the undersigned does not believe it is necessary for the Court to consider the prejudice prong of *Strickland* in connection with Cox's Ground One claims of Brigman failing to consult Cox regarding filing a notice of appeal and ignoring Cox's instruction to file an appeal. But if the District Court reaches this issue, the undersigned FINDS, for reasons explained above, that Cox has failed to demonstrate that there is a reasonable probability that, but for Brigman's alleged deficient failures to consult with him about an appeal, "he would have timely appealed." *See Flores-Ortega*, 528 U.S. at 484.

## IV. CONCLUSION AND RECOMMENDATION

The District Court should deny both grounds of Cox's Amended Motion.

## V. RIGHT TO OBJECT

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from

appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

ORDERED this 22nd day of August, 2023.

_____

JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE